**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 5, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JACK WAYNE McKERRELL, JR.,

    Defendant-Appellant.

No. 06-5209

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 06-CR-68-CVE)**

---

Timothy L. Faerber, Assistant United States Attorney (David E. O'Meilia, United States Attorney, with him on the brief), Tulsa, Oklahoma, for Plaintiff-Appellee.

Barry L. Derryberry, Assistant Federal Public Defender (John V. Butcher, Federal Public Defender, and Robert A. Ridenour, Assistant Federal Public Defender, with him on the brief), Tulsa, Oklahoma, for Defendant-Appellant.

_____

Before **BRISCOE**, **HOLLOWAY**, and **O'BRIEN**, Circuit Judges.
_____

**HOLLOWAY**, Circuit Judge.

The Supreme Court in Georgia v. Randolph, 547 U.S. 103, 126 S.Ct. 1515, 1519 (2006), held that the Fourth Amendment forbids a warrantless search of a shared dwelling for evidence over a physically-present resident's express

objection, notwithstanding his or her co-tenant's consent to search. We must decide whether barricading oneself in one's residence, in an unsuccessful effort to avoid a lawful arrest, vitiates a co-tenant's subsequent consent to search the residence. We hold that under the circumstances here, where the district court found that Defendant Jack McKerrell, Jr. ("McKerrell") barricaded himself in his residence to avoid arrest and never expressly objected to a possible search, McKerrell's co-tenant's consent justifies the challenged search. We also hold that the police removed McKerrell from the scene to carry out a lawful arrest, not to mute his potential objection to the search. We therefore affirm the district court's denial of McKerrell's motion to suppress.

## I. BACKGROUND

On February 24, 2006, an anonymous caller informed the Tulsa Police Department that McKerrell had outstanding arrest warrants, used methamphetamine, and possessed an assault rifle and a shotgun. R., Vol. I, Doc. 25, at 2. The police investigated this tip and discovered that McKerrell had two outstanding felony warrants from Tulsa County, Oklahoma, for possessing a stolen vehicle, two municipal traffic warrants from Tulsa, Oklahoma, and a four-count felony warrant from Craig County, Oklahoma, for drug and traffic charges. Id. Officers determined McKerrell's address by searching utility-company records. Id.

Less than two weeks later, another caller told the police that McKerrell was

working at home in his front yard. Id. In response, several police officers surrounded the residence and announced their presence. R., Vol. III, at 9-10. By that time, McKerrell was inside the home with his wife and young child, both of whom also resided at the home. Id. at 9, 12, 34. Instead of peacefully surrendering to the officers, however, McKerrell quickly closed the garage door and front door to barricade himself inside. Id. at 10.

Within minutes, Mrs. McKerrell exited the home, leaving McKerrell and their young child inside. Id. at 10, 12. The police began negotiating with McKerrell by calling a cell phone in the home and requesting, over the course of three or four conversations, that he surrender. Id. at 16, 17. Both parties dispute what was said during these conversations and McKerrell's motive for refusing to leave the house. Sergeant Middleton, who spoke with McKerrell on the phone, testified that McKerrell never objected to a search and was concerned solely with being arrested. Id. at 16. While Sergeant Middleton could not recall whether McKerrell told him not to enter the residence, id. at 17-18, the Sergeant clearly remembered that the conversation related entirely to whether McKerrell would allow the officers to execute the several valid arrest warrants. Id. at 20-21. Indeed, he testified that McKerrell never objected to a search. Id. at 16.

Sergeant Witt, another officer at the scene, testified similarly: McKerrell did not express an objection to a search either before or after the police arrested him. Id. at 6. McKerrell testified that he expressly informed the police several

times that he did not want them inside his home. Id. at 49. The district court found that McKerrell never expressly refused to provide his consent to search. R., Vol. I, Doc. 25, at 8-9. Instead, the district court credited the officers' testimony that the subject of these telephone conversations was McKerrell's desire to avoid arrest. Id.

After these three or four conversations, McKerrell decided to surrender peacefully. R., Vol. III, at 17, 12. The police handcuffed McKerrell immediately. Id. at 12. They did not speak to him about searching the residence or prohibit him from speaking with Mrs. McKerrell. Id. at 6; Id. at 23, 30. They merely placed him under arrest and transported him to the police station about five minutes later. Id. at 12. Sergeant Witt testified that the police did not remove McKerrell from the scene to prevent him from influencing Mrs. McKerrell's decision about consenting to a search. Id. at 13. More broadly, Sergeant Witt testified that the officers' decision to remove McKerrell from the scene was unrelated to their decision to search the house. Id. at 13-14. Sergeant Middleton confirmed that nothing unusual occurred: "it is not unusual [that we took McKerrell away from the scene so quickly]. Usually, once we make the arrest, we put them in the vehicle and transport them." Id. at 19-20.

After McKerrell had left the scene, Sergeant Witt asked Mrs. McKerrell to speak with him and Sergeant Petree. Id. at 5. The district court found no evidence that the police coerced her to do so. R., Vol. I, Doc. 25, at 8. Mrs.

-4-

McKerrell agreed to speak with the officers, and they all entered the home, with Mrs. McKerrell's permission, to begin the conversation. R., Vol. III, at 6.

Sergeant Witt used this conversation as an opportunity to determine how long the McKerrell family had lived at this home (about four years) and the scope of Mrs. McKerrell's authority over the home's interior. Id. at 7. Sergeant Witt testified that Mrs. McKerrell "[had] full run of the house," which he inferred from Mrs. McKerrell's statement that she did laundry in the home and was able to access every drawer and closet in the home. Id.

After discussing other questions that Mrs. McKerrell posed, primarily questions about McKerrell's bond, the officers asked Mrs. McKerrell for her consent to search the home. Id. at 8. Sergeant Petree presented Mrs. McKerrell with a consent form and explained its contents, which notified Mrs. McKerrell, *inter alia*, that she had the right to withhold her consent and the right to stop the search at any time. Id. at 8, 23-25; R., Vol. I, Doc. 23, Ex. 1. Mrs. McKerrell orally consented and then signed the form. R., Vol. III, 24-25; R., Vol. I, Doc. 23, Ex. 1. It is undisputed that McKerrell was absent when Mrs. McKerrell consented to this search. R., Vol. I, Doc. 25, at 9. The police then searched the home and found four firearms, which McKerrell possessed illegally.

Ultimately, McKerrell filed a motion to suppress, arguing that the officers violated the Fourth Amendment by searching his residence based on his wife's consent. R., Vol. I, Doc. 16. The district court denied McKerrell's motion

because Mrs. McKerrell's consent was sufficient to justify the search in light of McKerrell's failure to object to the search. R., Vol. I, Doc. 25, at 8-9. Specifically, the court found that McKerrell's conduct at the scene—shutting his doors and remaining inside—related solely to his desire to avoid arrest. Id. at 8. The district judge found "persuasive the testimony of the officers that defendant did not expressly refuse consent to search his home." Id. at 9. Thus, the court distinguished Georgia v. Randolph because McKerrell never "articulated 'express refusal of consent to a police search' to officers prior to [Mrs. McKerrell's] consent to search their home." R., Vol. I, Doc. 25, at 9 (citing 126 S.Ct. at 1523, 1528).

McKerrell then pleaded guilty to possessing firearms after a former felony conviction, a violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and received a sentence of 37 months' imprisonment, 3 years' supervised release, a $100 special assessment, and a $1,500 fine. R., Vol. I, Doc. 42. McKerrell reserved the right to appeal the denial of his motion to suppress the use as evidence of the firearms seized from his residence. R., Vol. I, Doc. 10, at 1, 3. He now appeals his conviction, asserting error in the district court's denial of his motion to suppress. We exercise jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

McKerrell challenges the search's constitutionality on two grounds: first, he says that the search violated the Fourth Amendment because barricading

-6-

himself in his residence conveyed his objection to the search and therefore precluded the officers from relying on his wife's consent; and second, he argues that the police removed him from the scene to avoid his possible objection to the search.

### A. The Effect of Mrs. McKerrell's Consent

### 1.

In reviewing the denial of a motion to suppress, we accept the district court's factual findings unless clearly erroneous, and we view the evidence in the light most favorable to the Government. United States v. Alcaraz-Arellano, 441 F.3d 1252, 1258 (10th Cir. 2006). We review de novo the ultimate determination of Fourth Amendment reasonableness. Id.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. This protection takes on special meaning when the challenged intrusion involves the home: "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." Welsh v. Wisconsin, 466 U.S. 740, 748 (1984). But the Fourth Amendment permits a warrantless entry and search of a home when the "police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained." Randolph, 126 S.Ct. at 1518.

Before Randolph was decided the question remained whether the police may search a home when one occupant sharing the residence consents, but the other occupant, who later seeks to suppress the evidence, is present at the scene and expressly refuses to consent. Randolph answered this question in the negative. In Randolph, the defendant's wife complained to the police that her husband took away their son following a domestic dispute. Id. at 1519. When the police arrived, the wife informed them that her husband was a cocaine addict, and she volunteered that "there were 'items of drug evidence'" in the house. Id. At this point, both the wife and the defendant were present at the home's entrance. The police first sought the defendant's consent to search the residence, but he expressly refused to consent. Id. So the police then turned to the wife and asked for her consent, which she gave. Id. Thereafter, the police searched the residence and found the defendant's cocaine.

Presented with these facts, the Supreme Court in Randolph set out to decide whether the wife's consent was sufficient to justify the search by noting that "[t]he constant element in assessing Fourth Amendment reasonableness in the consent cases . . . is the great significance given to widely shared social expectations . . . ." Id. at 1521. In other words, the Court characterized its precedent as holding not only that a co-tenant's consent may be valid as against an absent, nonconsenting tenant, but also that the reasonableness of the search is in significant part "a function of commonly held understanding about the

authority that co-inhabitants may exercise in ways that affect each other's interests." Id.

Applying this methodology, Randolph stated that "it is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, 'stay out.'" Id. at 1522-23. Instead, the Court reasoned that unless there is a recognized hierarchy between the co-tenants, they must resolve their conflict over use of their common quarters through voluntary accommodation, not by appeals to authority. Id. at 1523.

Randolph then analyzed the facts presented. It reasoned that since a tenant has no authority to open the door to a visitor over his or her co-tenant's objection, while present, a police officer has no better claim to the reasonableness of entering than the officer would have in the absence of consent. Id. Thus, the Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at 1526.

The Court in Randolph admitted that it was drawing a fine line by requiring the defendant to be at the scene and to expressly refuse to consent, but the Court reaffirmed that this is the line it drew when it stated that a search is constitutional even if the potential objector is nearby and not invited to take part in the

threshold colloquy. Id. at 1527.

**2.**

Unlike in Randolph, the present case does not invite a straightforward application of the rule that a physically-present co-tenant's express refusal to consent vitiates his or her fellow tenant's consent to search. The district court here found that McKerrell never refused consent to the search. R., Vol. I, Doc. 25, at 8-9. Moreover, although McKerrell argues that he impliedly refused to consent by staying in his home after the police arrived (which would still distinguish this case from Randolph because Randolph required an express objection), the district court disagreed here. Based on the officers' testimony, the district court instead found that the only reason McKerrell barricaded himself in his residence was "to avoid arrest and to avoid the possibility of armed officers coming into his home to forcibly arrest him while his son was also inside the home." Id. at 8. The court also credited the officers' testimony that, on the phone, McKerrell seemed to be concerned only with the validity of the arrest warrants, not with the possibility that the officers might search his residence.

The factual distinctions between this case and Randolph call into doubt Randolph's applicability. McKerrell urges this court to apply Randolph, and exclude the evidence obtained from his home, after deflecting our attention from these distinctions to the instant he shut the door when the officers first arrived at his house. McKerrell contends that his only concern at that moment was to

-10-

prevent the officers from entering his home—the functional equivalent of expressly refusing to consent to a search of the home. Principal Brief of Defendant/Appellant at 11 (citing United States v. Henderson, 2006 WL 3469538, at *1, *2 (N.D. Ill. 2006) (stating that the defendant "surely included a direction that . . . [the police] refrain from searching [his] residence" when he said "[g]et the fu*k out of my house")). To be sure, the district court could have inferred that shutting a door in the face of an imminent arrest amounts to an implied directive to the officers to stay out. Regardless, we conclude that Randolph's narrow holding does not apply here.

First, unlike in Henderson, the district court here found that McKerrell's sole concern was to avoid arrest, not to avoid arrest *and* prevent the officers from entering his home to search. The evidence supports this finding: McKerrell never told the officers to stay out of his home when they arrived; McKerrell discussed the arrest warrants when speaking on the phone with the police, but never expressed concern over the possibility of a search; and McKerrell never told the officers to stay out of his home after he surrendered and the police arrested him, arguably because his concern about being arrested dissipated upon his arrest.

While McKerrell asks us to infer that he impliedly refused to consent when he closed his doors to the police, the parties legitimately dispute whether this conduct related to McKerrell's desire to avoid arrest or to his desire to direct the officers to leave his property and refrain from searching, or both. Although

McKerrell testified that he objected to a search, the district court did not clearly err by finding that McKerrell acted solely to avoid arrest.

Second, whatever meaning we could decipher from McKerrell's actions, Randolph explicitly declined to conduct this inquiry when it required the defendant to have *expressly* objected to the search. See Randolph, 126 S.Ct. at 1519. While McKerrell characterizes Randolph as a sweeping pronouncement because Randolph's introductory paragraph stated that "a physically present co-occupant's stated refusal to permit entry prevails [over his co-occupant's consent]," id., McKerrell's argument ignores that this statement was tethered to the immediately preceding sentence (which asked whether a present co-tenant's *express* objection vitiated his co-tenant's consent), that Randolph carefully delineated the narrow circumstances in which its holding applied, and that Randolph consciously employed a rule requiring an express objection by a present co-tenant. See id. at 1527 (stating that "[t]his is the line we draw, and we think the formalism is justified . . . [because] there is value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he *expresses* it") (emphasis added). McKerrell asks us to ignore the Supreme Court's plain language, reject its consciously-imposed formalism, and apply a rule likely to beget the type of confusion Randolph intended to avoid. We reject this approach.

-12-

Third, even if we interpreted the district court's opinion as finding that McKerrell attempted to avoid arrest by impliedly directing the officers not to enter his residence to arrest him, the police were under no obligation to obey McKerrell's implied request. In <u>Valdez v. McPheters</u>, we held that an arrest warrant could support the search of a dwelling when (1) the dwelling is the suspect's home, and (2) the police have an objectively reasonable belief that the suspect "could be found within at the time of entry." 172 F.3d 1220, 1225 (10th Cir. 1999). There is no dispute that McKerrell lived at the dwelling where the police found his firearm. Likewise, there is no dispute that the police reasonably believed that McKerrell could be found within the dwelling. Although <u>Valdez</u> does not justify the search here because the officers removed McKerrell from the scene before entering the house, <u>Valdez</u> demonstrates that McKerrell's alleged instructions did not erect a legal barrier at his threshold. In other words, that the officers did not immediately enter the home in this case reflects their attempt to peacefully resolve a potentially dangerous confrontation, not their understanding that they had somehow been denied their authority to enter McKerrell's home. There is no question that the police could have rebuked McKerrell's door-closing tactic by resorting to the battering ram.

For these reasons, McKerrell's reliance on <u>Randolph</u> is misplaced. He never expressly objected to the search, according to the finding which the record supports. Therefore, <u>Randolph</u>'s holding does not apply here.

-13-

**3.**

We are now left where <u>Randolph</u> began, noting that the reasonableness of the search is in significant part "a function of commonly held understanding about the authority that co-inhabitants may exercise in ways that affect each other's interests." <u>Randolph</u>, 126 S.Ct. at 1521. Here, that understanding amounts to the following principle: a co-tenant's consent to search a shared residence may be valid as against an absent, nonconsenting tenant. <u>Id.</u>; <u>United States v. Matlock</u>, 415 U.S. 164, 170 (1974). <u>See also</u> <u>Randolph</u> 126 S.Ct. at 1527 (stating that a nearby potential objector "loses out" when the police do not invite him to take part in the conversation in which his co-tenant gives permission to search).

Mrs. McKerrell exercised authority over the common area that she allowed the officers to search, and the district court did not clearly err by finding that McKerrell did not object to the search. In light of these facts, we find no error in the district court's conclusion that the officers complied with the Fourth Amendment by relying on Mrs. McKerrell's consent to search the residence.

## B. Removing McKerrell from the Scene

McKerrell also argues that the "evidence in this case indicates that removal of the Defendant minutes after his arrest was for the sake of avoiding his protest of a search." Principal Brief of Defendant/Appellant at 12. McKerrell relies on the limitation imposed by <u>Randolph</u> that a search might be unconstitutional "[if there is] evidence that the police have removed the potentially objecting tenant

-14-

from the entrance for the sake of avoiding a possible objection . . . ." Randolph, 126 S.Ct. at 1527. McKerrell infers that this occurred here because "any police officer would have had a design to search [McKerrell's] residence if the legal opportunity developed" after receiving a tip that McKerrell possessed guns and drugs. Principal Brief of Defendant/Appellant at 12. In other words, McKerrell argues, the fact that the officers searched his residence demonstrates that the officers planned to search the residence, and this search could occur only after avoiding McKerrell's potential objection by removing him from the scene.

McKerrell's argument begs the question by leaping to its conclusion from the innocuous inference that the police searched McKerrell's residence because they planned to do so "if the legal opportunity developed," id. Despite McKerrell's speculations, we must ask only whether the *evidence* shows that the officers removed McKerrell from the scene to avoid his possible objection. And on this point, there is no evidence that the police removed McKerrell for this reason.

The evidence does show that the police removed McKerrell from the scene and transported him to the police station to carry out a lawful arrest. But McKerrell has not directed our attention to anything suspicious about the procedures that the police employed. Instead, his analysis essentially urges us to accept his unjustified speculations and circumvent Randolph's evidentiary requirement. Randolph stated that there must be *evidence* that the police removed

the potentially objecting tenant from the scene to avoid his or her objection. See Randolph, 126 S.Ct. at 1527. Since there is no evidence that the police prevented McKerrell from objecting to the search when he was at the scene, and since there is no evidence that the officers removed McKerrell for any reason other than completing the arrest, we have no reason to invoke Randolph's admonishment that officers may not remove a defendant from the threshold to silence his or her potential objection.

McKerrell also argues that the police might invoke the justification that they removed an arrestee to effect his or her arrest every time they arrest a defendant—implying that accepting the officers' justification would immunize any post-arrest removal and consent search from Fourth Amendment challenge. See Principal Brief of Defendant/Appellant at 12. But this observation does not advance McKerrell's case. His argument wholly relies on the fact that the police searched his residence, and therefore would have had the "design" to search, to show that the police arrested and removed him to avoid his potential objection. Accepting this speculation would come perilously close to adopting a rule that the police must either invite a defendant into the threshold colloquy with the co-tenant or otherwise suspend their normal arrest procedures and await a defendant's potential objection, however long it might take, before transporting him or her to the station. Randolph does not support either approach. As McKerrell concedes, the Supreme Court in Randolph expressly rejected the notion

-16-

that the police may not remove a potential objector from the scene until they ask for the potential objector's consent to search. Randolph, 126 S.Ct. at 1527-28; see also id. at 1527 (stating that "[t]here is no ready reason to believe that efforts to invite a refusal would make a difference in many cases, whereas every co-tenant consent case would turn into a test about the adequacy of the police's efforts to consult with a potential objector").

Randolph did not upset the procedures that may be employed following an arrest; it merely suggested that the Fourth Amendment might prohibit a search when evidence shows that the police removed the defendant from the scene to avoid his or her potential objection to the search. Although evidence that the police used an arrest as a tool to avoid a possible objection might trigger Randolph, the bare fact that the police arrested McKerrell and brought him to the police station does not support such a conclusion here.

### III. CONCLUSION

The record supports the finding that McKerrell never expressly objected to the search that he now challenges. Additionally, the police removed McKerrell from the scene to complete an arrest, not to stifle his possible objection to the subsequent search, according to findings the record supports. The district court's decision to deny the motion to suppress is therefore

**AFFIRMED**.