**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RYAN J. BONIVERT,
             *Plaintiff-Appellant*,

v.

CITY OF CLARKSTON; COUNTY OF
ASOTIN, WASHINGTON; GARY
SNYDER; JOSEPH SNYDER; JENNIFER
L. SNYDER; SHAWN RUDY, Deputy;
GRIMM, Deputy; PAUL PURCELL;
TERESA R. PURCELL; DANIEL
COMBS; CLAUDIA A. COMBS,
             *Defendants-Appellees.*

No. 15-35292

D.C. No.
2:14-cv-00056-
TOR

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Thomas O. Rice, Chief District Judge, Presiding

Argued and Submitted August 28, 2017
Seattle, Washington

Filed February 26, 2018

Before:  Michael Daly Hawkins and M. Margaret
McKeown, Circuit Judges, and Barbara Jacobs Rothstein,[*]
District Judge.

Opinion by Judge McKeown

---

## SUMMARY[**]

---

### Civil Rights

The panel reversed the district court's grant of summary judgment on qualified immunity grounds and remanded in a 42 U.S.C. § 1983 action in which plaintiff alleged that police officers violated his Fourth Amendment rights when they forced their way into his home without a warrant, threw him to the ground and then tasered and arrested him.

The panel held that the scenario in this case closely paralleled *Georgia v. Randolph*, 547 U.S. 103 (2006), where the Supreme Court held that a warrantless search was unreasonable as to a defendant who is physically present and expressly refuses consent to entry.  Following the Court's reasoning, the panel concluded that the warrantless entry into plaintiff's home violated the Fourth Amendment as none of the lawful exceptions to the warrant requirement applied.  The panel further held that the evidence did not justify the district court's conclusion that "no reasonable jury could find the use of force within the home excessive."  The

---

[*] The Honorable Barbara Jacobs Rothstein, United States District Judge for the Western District of Washington, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

panel concluded that genuine issues of fact prevented a determination of qualified immunity at summary judgment such that the case must proceed to trial.

## COUNSEL

James E. Lobsenz (argued), Carney Badley Spellman P.S., Seattle, Washington, for Plaintiff-Appellant.

Christopher Joseph Kerley (argued), Evans Craven & Lackie P.S., Spokane, Washington, for Defendant-Appellee City of Clarkston.

Ann Elizabeth Trivett (argued) and Thomas P. Miller, Christie Law Group PLLC, Seattle, Washington, for Defendants-Appellees County of Asotin, Gary Snyder, Joseph Snyder, Jennifer L. Snyder, Shawn Rudy, Deputy Grimm, Paul Purcell, Teresa R. Purcell, Daniel Combs, and Claudia A. Combs.

**OPINION**

McKEOWN, Circuit Judge:

"An open door says, 'Come in,'" the poet Carl Sandburg once wrote. "If a door is open and you want it open, why shut it?"[1] The corollary, of course, is that a locked door says, "stay out," and a shut door certainly does not say, "come in."

This appeal arises out of a domestic dispute call to the police from the home of Ryan Bonivert. During an evening gathering with friends, Bonivert reportedly argued with his girlfriend, Jessie Ausman, when she attempted to leave with the couple's nine-month old daughter. By the time police arrived, the disturbance was over: Ausman, the baby, and the guests had safely departed the home, leaving Bonivert alone inside. At that point, there was no indication that Bonivert had a weapon or posed a danger to himself or others. Nor does the record suggest that Ausman intended to reenter the house or otherwise asked police to accompany her inside. When Bonivert failed to respond to repeated requests to come to the door, the officers decided they needed to enter the house. No attempt was made to obtain a search warrant. Though Bonivert locked the door to his house and refused police entreaties to talk with them, the police broke a window to unlock and partially enter the back door. Even then, Bonivert tried to shut the door, albeit unsuccessfully. Although Ausman consented to the officers entering the house, Bonivert's actions were express—stay out. Nevertheless, the officers forced their way in, throwing

---

[1] THE SANDBURG RANGE 119 (1957).

Bonivert to the ground, and then drive-stunned him with a taser several times,[2] handcuffed him, and arrested him.

The scenario here closely parallels *Georgia v. Randolph*, 547 U.S. 103 (2006), where the Supreme Court held that a warrantless search was unreasonable as to a defendant who is physically present and expressly refuses consent to entry. *Id.* at 106.  Following the Court's reasoning, we conclude that the warrantless entry into Bonivert's home violated the Fourth Amendment as none of the lawful exceptions to the warrant requirement applied.  The officers are not entitled to qualified immunity.

## BACKGROUND

In the early morning hours of January 8, 2012, Sergeant Danny Combs and Officer Paul Purcell of the City of Clarkston, Washington (the "City") Police Department received a "physical domestic" dispatch to the home of Ryan Bonivert.  The dispatcher relayed to the officers that an argument between a man and a woman had become "physical at one point," and that the dispatcher had been "advised the male," Bonivert, "was inside the house being restrained by other males," and "the female," Bonivert's girlfriend Jessie Ausman, was "outside in a car with a child."

When Purcell and Combs arrived, they encountered five people standing in front of Bonivert's house: Ausman; Ausman's sister, Tasha; Ausman's mother, Ann McCann;

---

[2] "When a taser is used in drive[-]stun mode, the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim.  In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system as it does in dart-mode." *Mattos v. Agarano*, 661 F.3d 433, 443 (9th Cir. 2011).

James Gray; and Brad Miller.  Purcell spoke to the three women, who reported that the entire group, including Bonivert, had been at a social gathering in the house. Bonivert and Ausman, who had a nine-month old daughter and had been living together in Bonivert's home for the past two years, began arguing about their relationship when Ausman announced that she was leaving with the baby. Bonivert reportedly became angry.  According to the women, Bonivert grabbed Ausman and threw her to the ground.  Ausman further told the officers that all of the adults in the residence had been drinking that evening.

Combs, meanwhile, interviewed Gray and Miller.  Both men told Combs that in the middle of an argument, Ausman had told Bonivert that she was leaving with the baby. According to Gray and Miller, Bonivert warned Ausman she was not leaving with the child and attempted to "rush[]" her, but Miller tackled Bonivert before he could make contact, enabling Ausman to safely exit the house with the baby.  The only difference in Gray and Miller's version of events and that of the women was that neither saw "anything physical" occur between Bonivert and Ausman.  Bonivert later stated that after Ausman and his guests had departed, he decided to go to bed.  Bonivert remained inside the house during the entirety of the officers' conversations with the witnesses.

The officers exchanged narratives and, after discussing the discrepancies between the men and women's stories, decided to speak to Bonivert.  The officers initially approached the front door of the residence, knocked, identified themselves as police, and instructed Bonivert to come to the door.  Combs testified that he believed—but was uncertain whether—Bonivert heard the initial knock-and-announce.  Bonivert testified that he heard yelling and loud

banging on the front door, but did not know who was there or what was being said.

Receiving no response from Bonivert, Combs knocked on other doors and windows of the house, peering into the windows using his flashlight. The officers found that both the front door and the back door were locked. As Combs approached the side door, Bonivert realized it was unlocked and locked the deadbolt from inside. Combs, upon hearing the door lock, believed that Bonivert did not want to speak or have any contact with him. After Bonivert locked the side door, he heard someone outside announce that they were police and ask him to come outside. Purcell testified that at some point, Combs yelled loudly, "Come out or we are coming in," or words to that effect. Bonivert, however, made no attempt to speak to the officers.

The officers went back to the front of the house to question the witnesses again. In response to an inquiry whether Bonivert was a danger to himself, Ausman informed Combs that there were no weapons in the home. Ausman also told police that she did not believe Bonivert was a danger to himself. When the officers inquired how Bonivert would respond to having his home broken into, Ausman warned Combs that Bonivert had a problem with authority and recounted Bonivert's angry—but not violent—behavior towards officers during a recent drunk driving arrest.

At this point, Combs decided he needed to assess Bonivert's condition. Combs claims he wanted to "find out what was going on, to assess [Bonivert]" and "see what his state of mind were [sic]." According to Combs, he was concerned by the fact that Bonivert was "not talking to" the officers. Ausman, who had been living in Bonivert's home for approximately two years, gave Sergeant Combs permission to enter the house. The parties dispute whether

Ausman also gave permission for Combs to break a door or window to gain entry. Nothing in the record suggests, however, that Ausman intended to reenter the home or asked Combs for his assistance to do so.

Combs and Purcell requested assistance from the Asotin County Sheriff's Office (the "County").[3] The officers also radioed a "Code 4" message to the County, which meant that "there are no problems" with "the police and the people they are with," and that everyone is "safe" and nobody is "being injured."

Upon arrival, Asotin County Deputies Gary Snyder and Joseph Snyder spoke with Combs, who told them that Bonivert was locked inside the residence and refused to come out after a physical encounter with his wife. Combs requested their assistance to enter the house. The County deputies were aware that the City officers did not have a warrant to enter the home or arrest Bonivert. They did not obtain information about who owned the residence, who lived at the residence, whether there were outstanding arrests, or what basis the City officers had for entering the home. Instead, the County deputies deferred to Combs, the highest ranking City officer on the scene.

The officers collectively developed a plan of entry. Purcell remained stationed at the front door, on the east side of the residence, while Combs and the County deputies went around to the north side of the residence. Combs again knocked on the side and back doors, identified himself as the police, and advised Bonivert to open the door. Combs and

---

[3] Because the City of Clarkston is located within Asotin County, County officers will respond to requests for assistance from the City when the incident is within the City of Clarkston.

Gary Snyder directed their flashlights through the windows and saw Bonivert retreat into the back of the house. On at least one occasion when a flashlight beam hit Bonivert, he ducked out of sight. Combs then approached the back door, with Joseph Snyder directly behind him and Gary Snyder standing farther back to maintain visibility of the front door.

Combs used his flashlight to shatter a window pane on the back door and reached through the opening to unlock it. At that point, Bonivert opened the door and began shouting that the officers were going to pay for the damage to his window. Combs stated that he ordered Bonivert to stay back, calm down, and get on the ground. Joseph Snyder similarly ordered Bonivert to get on the ground and show his hands. Bonivert disputed that he was given these commands and stated that there were flashlights pointed at him, which caused him to lower his hands to shield his eyes, and that he was unable to understand what the officers were saying. The parties dispute whether Bonivert advanced upon the officers, or remained at the door. The video footage from the taser is inconclusive: it appears to show Bonivert at the threshold of the door.

Without warning, Combs and Gary Synder then deployed their tasers at Bonivert in dart mode. In response, Bonivert brushed off the darts, cursed at the officers, and attempted to close the door. Before Bonivert could completely close the door on the officers, however, Combs shoved the door open with enough force to throw Bonivert to the other side of the room, and the officers entered the home.

Once inside the house, the parties dispute whether Bonivert swung his fists and attacked Combs. In any event, Joseph Snyder tackled Bonivert to the ground while Combs drive-stunned Bonivert multiple times in his upper right

shoulder.  Eventually, all three officers held Bonivert to the ground.  Bonivert can be heard in the taser video—in response to an officer's repeated commands to "give me your hands" and "hold still"—screaming "no," "why," and "why are you in my house?," and sobbing.  Combs deployed his taser in drive-stun mode once more after Bonivert was handcuffed.  Comb's taser report shows his taser was activated in drive-stun mode four times within approximately one minute.  Bonivert was placed under arrest for assaulting an officer, resisting arrest, and domestic violence assault in the fourth degree.

Bonivert brought claims under 42 U.S.C. § 1983 against the City, the County, Combs, Purcell, Gary Synder, and Joseph Synder, alleging warrantless entry and excessive force in violation of Bonivert's constitutional rights.  The district court granted summary judgment in favor of the defendants on the basis of qualified immunity.

## ANALYSIS

### I.  FRAMEWORK FOR QUALIFIED IMMUNITY ANALYSIS

Our de novo review of a grant of summary judgment based on qualified immunity involves two distinct steps: government officials are not entitled to qualified immunity if (1) the facts "[t]aken in the light most favorable to the party asserting the injury . . . show [that] the [defendants'] conduct violated a constitutional right" and (2) "the right was clearly established" at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *rev'd on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009); *see also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his

conduct was unlawful in the situation he confronted."). Both prongs entail questions of law that we may answer in either order. *Pearson*, 555 U.S. at 236. If a "genuine issue of material fact exists that prevents a determination of qualified immunity at summary judgment, the case must proceed to trial." *Serrano v. Francis*, 345 F.3d 1071, 1077 (9th Cir. 2003).

Since the Fourth Amendment guarantees the right to be free from "unreasonable searches and seizures," U.S. Const. amend. IV, the first question—whether the officer violated a constitutional right—will typically turn on the "reasonableness" of the officer's actions. *See Mattos*, 661 F.3d at 442. But notably, the reasonableness standard governing violations of a Fourth Amendment right is distinct from the reasonableness standard governing whether the right was "clearly established." *Saucier*, 533 U.S. at 204–05. The former protects an officer who reasonably, but mistakenly, perceives facts that would have made his actions lawful had they been true. *See id.* at 206 ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause or exigent circumstances, for example, and in those situations courts will not hold that they have violated the Constitution."). The latter, by contrast, goes further by acknowledging "that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Id.* at 205. Thus, even an officer who correctly perceives the facts establishing that his conduct was "unreasonable" under the Fourth Amendment is entitled to immunity if he was mistaken "as to what the law require[d]" under the circumstances, so long as the mistake was "reasonable." *Id.*

Importantly, though, "it is not necessary that the alleged acts have been previously held unconstitutional" in order to

determine that a right was clearly established, "as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005) (alterations in original) (internal quotation marks omitted). In some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *United States v. Lanier*, 520 U.S. 259, 271 (1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

These parameters counsel that officials may "still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). We are particularly mindful of this principle in the Fourth Amendment context, where the constitutional standard—reasonableness—is inevitably a fact-intensive inquiry. After all, "[i]f qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations of the Fourth Amendment." *Mattos*, 661 F.3d at 442. Such a result would not further the purpose of qualified immunity to balance the competing "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

## II. FOURTH AMENDMENT UNLAWFUL ENTRY CLAIM

The officers' entry into Bonivert's house—his "castle"—requires us to invoke bedrock Fourth Amendment principles. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and

effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  It has long been recognized that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *Payton v. New York*, 445 U.S. 573, 585–86 (1980) (quoting *United States v. U.S. Dist. Court for E. Dist. of Mich.*, 407 U.S. 297, 313 (1972)).  This "special protection" of the home "as the center of the private lives of our people" reflects an ardent belief in "'the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown.'"  *Randolph*, 547 U.S. at 115 (quoting *Minnesota v. Carter*, 525 U.S. 83, 99 (1998); *Miller v. United States*, 357 U.S. 301, 307 (1958) (internal alterations omitted)).  For that reason, "[i]t is a 'basic principle of Fourth Amendment law'" that warrantless searches of the home or the curtilage surrounding the home "are presumptively unreasonable." *Payton*, 445 U.S. at 586 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 477 (1971)).

Among constitutional rules, few are as well established, frequently applied, and familiar to police officers as the warrant requirement and its exceptions.  Because there is no dispute that the officers failed to obtain a warrant before entering Bonivert's home, the entry was presumptively unreasonable.  The officers argue that their entry was nevertheless justified by the three exceptions to the warrant requirement:  consent, emergency aid, and exigent circumstances.  Alternatively, the officers claim they are entitled to qualified immunity because it was not clearly

established law that these exceptions did not justify a warrantless entry under the circumstances.[4]

This is not a case involving "such an undeveloped state of the law" that qualified immunity is necessary to protect the officers from the special unfairness that results when they are "expected to predict the future course of constitutional law." *Wilson v. Layne*, 526 U.S. 603, 617–18 (1999) (quoting *Procunier v. Navarette*, 434 U.S. 555, 562 (1978) (internal quotation marks omitted)). Rather, it is one demanding "knowledge of . . . basic, unquestioned constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322 (1975). To the extent the officers were mistaken "as to what the law require[d]" to justify a warrantless entry that evening, we conclude their mistake was not "reasonable." *Saucier*, 533 U.S. at 205.

Taken in the light most favorable to Bonivert, *Saucier*, 533 U.S. at 201, the facts demonstrate that the officers violated Bonivert's constitutional right because no exception to the Fourth Amendment's warrant requirement justified the officers' entry into Bonivert's home. Additionally, the unlawfulness of the officers' entry under each exception was clearly established because it "was apparent in light of pre-existing law." *San Jose Charter*, 402 F.3d at 977 (internal quotation mark omitted). We explain our holding with respect to each exception below.

---

[4] Because the district court concluded that the officers were entitled to qualified immunity based on both the consent exception and the emergency exception, it did not reach the issue of whether the exigency exception, including "hot pursuit," applied. The parties briefed those issues at the summary judgment stage and on appeal. We address the exigent circumstances exception, including "hot pursuit," on de novo review.

## A.  WARRANTLESS ENTRY: CONSENT EXCEPTION

Although the consent exception ordinarily permits warrantless entry where officers have obtained consent to enter from a third party who has common authority over the premises, *Georgia v. Randolph* held that an occupant's consent to a warrantless search of a residence is unreasonable as to a co-occupant who is physically present and objects to the search.  547 U.S. at 106.  Such is the situation here.

By way of background, the Court in *Randolph* noted that the "constant element in assessing Fourth Amendment reasonableness in . . . consent cases" has been "the great significance given to widely shared social expectations." *Id.* at 111.  The Court went on to explain that "[s]ince the co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Id.* at 114.  For that reason, the Court held that "a physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant." *Id.* at 122–23.  *Randolph* stands in contrast to a situation in which a co-occupant grants access to enter a shared dwelling but the co-occupant is absent. *See United States v. Matlock*, 415 U.S. 164, 170–71 (1974).

Although *Randolph* was decided in the context of an evidentiary search, there is no talismanic distinction, for Fourth Amendment purposes, between a warrantless "entry" and a warrantless "search."  "The two intrusions share this fundamental characteristic: the breach of the entrance to an

individual's home."  *See Payton*, 445 U.S. at 589.[5]  As a matter of clearly established law, "the Fourth Amendment has drawn a firm line at the entrance to the house.  Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant."  *Id.* at 590.

Indeed, *Randolph* called out an important exigent circumstance related to domestic violence, explicitly acknowledging that a co-occupant's refusal is vitiated where there is a threat to the victim: "No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to *protect a resident from domestic violence*."  547 U.S. at 118 (emphasis added); *see also id*. at 119 (citing cases involving the emergency aid and exigent circumstances exceptions to support that "there is no danger that the fearful occupant will be kept behind the closed door of the house simply because the abusive tenant refuses to consent to a search").  Later in the opinion, we specifically discuss that neither the exigent circumstances nor emergency aid exception is applicable.  Here, it is important to underscore that neither Ausman nor the baby were in danger because they were safely outside the house when police entered.

Applying *Randolph*, we hold that the consent exception to the warrant requirement did not justify the officers' entry into Bonivert's home.  Even though the officers secured Ausman's consent, Bonivert was physically present inside

---

[5] Before Bonivert's arrest, other courts had already applied *Randolph* to police entries and searches generally.  *See, e.g.*, *United States v. Uscanga-Ramirez*, 475 F.3d 1024, 1027–28 (8th Cir. 2007); *Richardson v. City of Antioch*, 722 F. Supp. 2d 1133, 1140 (N.D. Cal. 2010).

and expressly refused to permit the officers to enter on two different occasions.

As the district court recognized, Bonivert expressly refused entry when he locked the side door to his house. During the initial "knock and talk," Combs and Purcell knocked and attempted to open the front and back doors to the house, but found them to be locked. As the officers circled the house to approach the side door, Bonivert realized it was unlocked and locked it as Combs was approaching. Combs heard the door lock and informed Purcell.

Bonivert also expressly refused entry when he attempted to close the back door on the officers after Combs broke in.[6] Once the officers decided to enter the home by force, Combs used his flashlight to shatter a window pane in the back door, reached through the opening, and unlocked the door. At that point, Bonivert partially opened the door and confronted the officers, which prompted the officers to fire their tasers in dart mode. All parties agree that after the darts failed to make contact, Bonivert tried to shut the door, placing it between himself and the officers, but ultimately was prevented from doing so when Combs rushed through with such force that he threw Bonivert to the other side of the room.

The City and County dispute that Bonivert's conduct at the side and back doors constituted "express refusal" of consent within the meaning of *Randolph*. According to the County, "express refusal means verbal refusal." We

---

[6] The parties dispute whether Ausman gave the officers permission to break into the house, rather than enter it. Ausman testified that the officers "said, he's not opening or answering any of the doors. He said, do I have permission to enter your home? And I said, yes." Ausman also stated that she "didn't know that they were going to break the door."

disagree, as this interpretation finds no support in either common sense or the case law. For example, a few years before *Randolph*, the Sixth Circuit held a warrantless entry unlawful under the Fourth Amendment when the inhabitant of a residence attempted to close the door on police officers, but one of the officers wedged his foot in the doorframe, forced the door open, and proceeded inside. *See Cummings v. City of Akron*, 418 F.3d 676, 679, 685 (6th Cir. 2005). The Sixth Circuit explained that the inhabitant's "attempt to close the door constituted a termination of the consensual encounter, and *communicated his lack of consent* to any further intrusion by the officers." *Id.* at 685 (emphasis added) (citation and internal quotation marks omitted); *see also Vinson v. Vermilion Cty.*, 776 F.3d 924, 930 (7th Cir. 2015) ("In fact, upon first seeing the men approach the house, [the defendant's daughter] ran inside and locked the door, hardly the actions of a person consenting to a search of the home.").

Not long after *Randolph*, the Eighth Circuit held that a co-occupant's consent to search "was no longer valid once [the defendant]," who was physically present and shared common authority over that room, "*slammed the door and put the dead bolt on*." *United States v. Williams*, 521 F.3d 902, 907 (8th Cir. 2008) (emphasis added) (citing *Randolph*, 547 U.S. at 121; *United States v. Sanders*, 424 F.3d 768, 775 (8th Cir. 2005)).[7] Applying the law clearly established in both *Randolph* and *Williams*, Ausman's consent "was no longer valid once" Bonivert expressly refused entry by "put[ting] the dead bolt on" and attempting to "slam[] the door" on the officers. *See id.* A reasonable officer would

---

[7] The Eighth Circuit ultimately upheld the lawfulness of the search under the exigency exception to the warrant requirement. *See* 521 F.3d at 908–09.

have understood this to be the case. And although *Randolph* is an objective test, we emphasize that this was, in fact, Combs' subjective conclusion: when Combs heard the side door lock, he specifically formed the opinion that Bonivert "didn't want to talk to [him]" and "didn't want contact with [him]." While not dispositive, Combs' testimony leaves no doubt that Bonivert's refusal of consent was "express."[8]

Based on the foregoing, we hold that the officers are not entitled to qualified immunity under the consent exception to the Fourth Amendment's warrant requirement. Simply put, a reasonable officer would have understood that no means no.[9]

---

[8] The City's reliance on *United States v. McKerrell*, 491 F.3d 1221 (10th Cir. 2007), is misplaced. The police had outstanding warrants to arrest McKerrell. When they showed up to do so, McKerrell barricaded himself in the house, which the court concluded "related solely to his desire to avoid arrest." *Id.* at 1224. After McKerrell peacefully surrendered, his wife gave consent to search the house. The factual findings, warrants, peaceful surrender, and timing of the wife's consent place this case far beyond the teachings of *Randolph* or Bonivert's situation.

[9] Although it does not bear on our qualified immunity analysis because it was decided after the events giving rise to this appeal took place, we note that our decision in *United States v. Moore*, 770 F.3d 809 (9th Cir. 2014), is entirely consistent with the preceding analysis. In *Moore*, we upheld a warrantless entry and search as valid where the defendant's fiancée consented to the search of their joint residence and Moore, the defendant, failed to respond to the officers entirely. Key to our decision was the distinction we made between the "express refusal" in *Randolph* and Moore's inaction. *Id.* at 813–14. We termed such behavior "[a]cquiescence" to Jones's consent and concluded that Moore's refusal of entry was at best "implicit" because, unlike the defendant in *Williams*, Moore failed to "*engage in any affirmative conduct to physically prevent the police officers from coming inside the house.*" *Id.*

### B. WARRANTLESS       ENTRY:       EMERGENCY
###    EXCEPTION

The emergency aid exception permits law enforcement officers to "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  An entry pursuant to the emergency aid exception "is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'"  *Id.* at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978)) (alteration in original). However, "the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests," *Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984), because the emergency exception is "narrow" and "rigorously guarded," *see, e.g.*, *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005).

Viewing the facts in the light most favorable to Bonivert, there were simply no circumstances pointing to an actual or imminent injury inside the home.  By the time the officers arrived, both Ausman and the child were safely outside, surrounded by four other adults intent on protecting them from harm.  During the entire time that the officers spoke to the witnesses, circled and attempted to enter the home from various points, and called on Deputies Gary and Joseph Snyder for backup, the house was silent.  Ausman further assured the officers that there were no weapons in the house

---

(emphasis added).   Here, of course, it is undisputed that Bonivert engaged in affirmative conduct to prevent the police from entering his home both when he locked the side door and when he attempted to close the back door on the approaching officers.

and that Bonivert did not pose a danger to himself. Ausman's statements were all but confirmed by Combs on at least two separate occasions, when Combs peered into different windows and "observed [Bonivert] inside" with no visible injuries or weapons on his person. Most tellingly, though, Combs and Purcell acknowledged that they sent a "Code 4" message to the deputies, indicating that "the police and the people they are with . . . [are] not being injured," before the deputies had even arrived. Purcell later confirmed that a "Code 4" message means that "there is no immediate danger of death or significant harm."

The officers contend that within the unique "context of a police domestic violence response," Bonivert's behavior led them to believe it was necessary to enter the home in order to prevent him from hurting "himself or others, including [the] officers." Combs explained that "domestic violence calls, by their nature, are volatile, emotionally charged, and unpredictable." We agree, and we recognize the especially volatile nature of domestic disputes, where "violence may be lurking and explode with little warning." *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005) (quoting *Fletcher v. Clinton*, 196 F.3d 41, 50 (1st Cir. 1999)). Nevertheless, we have refused to hold that "domestic abuse cases create a per se" emergency justifying warrantless entry. *United States v. Brooks*, 367 F.3d 1128, 1136 (9th Cir. 2004).

Indeed, all of our decisions involving a police response to reports of domestic violence have required an objectively reasonable basis for believing that an *actual or imminent injury* was unfolding in the place to be entered. *See, e.g.*, *United States v. Black*, 482 F.3d 1035, 1039 (9th Cir. 2007); *Brooks*, 367 F.3d at 1135; *Martinez*, 406 F.3d at 1162, 1165. In *Randolph*, the Supreme Court reinforced that "domestic

abuse is a serious problem in the United States."  547 U.S. at 117.  But the Court went on to say that *Randolph* "has no bearing on the capacity of the police to protect domestic victims."  *Id.* at 118.

Combs offered no objectively reasonable basis to suggest that Bonivert could harm a third party, as Bonivert was alone in the residence.  Nor did Combs offer an objective reason that Bonivert was a harm to himself, other than that "[Bonivert] was . . . hiding" from officers inside the house.  Any belief about Bonivert's past volatility was belied by Ausman's statement that Bonivert was not a danger to himself or others.

Combs' only mention of an actual threat was in terms so general that they could apply to any interaction involving a criminal suspect in a home.  Combs stated that he did not credit Ausman's "statement about there being no weapons in the residence" because he "always assume[s] there are weapons in a residence, including clubs and knives."  But construing such testimony as justifying entry would eviscerate the warrant requirement and support warrantless entry in response to every reported domestic dispute where the suspect remains inside the home.  We refuse to extend the emergency aid exception to such an inflexible assumption, as opposed to a reasonable belief.

Ultimately, the record in this case stands in stark contrast to any other case in which we have held, under the emergency aid exception, that officers responding to reports of a domestic dispute had "an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm."  *See United States v. Snipe*, 515 F.3d 947, 952 (9th Cir. 2008).  The facts matter, and here, there are at least triable issues of fact as to whether "violence was imminent," and whether warrantless entry

was justified under the emergency aid exception. *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam). The officers are not entitled to qualified immunity under the emergency aid exception.

## C. WARRANTLESS ENTRY: EXIGENCY EXCEPTION

The exigency exception permits warrantless entry where officers "have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (citation and internal quotation marks omitted). Not one of these circumstances is present here, as counsel for the City candidly acknowledged at oral argument: "I would agree with Mr. Bonivert that the cases indicate that if the . . . alleged victim of the domestic violence is not in the house and is instead standing outside and in no apparent jeopardy, as long as there's . . . nothing else going on inside the house, exigent circumstances doesn't really fit." Bonivert, who was inside his home when the alleged domestic assault occurred and remained there even after the officers broke into his back door, was never a "fleeing suspect." *See Kentucky v. King*, 563 U.S. 452, 460 (2011). The officers never articulated any other "legitimate" law enforcement justification for entry under the exigency exception.

Our decision in *Martinez*, which reads like a template for this case, squarely forecloses application of the exigency exception. In *Martinez*, we explained:

> [T]he exigency doctrine is inapplicable
> because the officer did not believe that

evidence of a crime would be found inside the house.  When the domestic violence victim is still in the home, circumstances may justify an entry pursuant to the exigency doctrine.  In *Brooks*, we applied the exigency doctrine to allow entry when loud fighting had been heard, the officers saw the room in disarray, and the victim was still on the premises but not visible to the officers.  As we noted in that case, the officers had probable cause to suspect evidence of crime and had an exigent need to enter the premises to make sure that the victim was safe.  Here, in contrast, the victim had left the premises and the officer did not have probable cause to believe there was contraband or evidence of a crime in the house.

406 F.3d at 1164 (internal citations omitted).  As in *Martinez*, the alleged victim of the domestic assault, Ausman, was safely outside the home before the officers even arrived.  Because the officers, like those in *Martinez*, indisputably had no "probable cause to believe that [there was] contraband or evidence of a crime [in Bonivert's house]," the exigency doctrine did not justify their entry.  *Id*.

We recognize that police officers responding to reports of domestic violence are "not conducting a trial, but" rather are "required to make . . . on-the-spot decision[s]."  *Black*, 482 F.3d at 1040.  In this case, however, the facts of the situation did not entitle officers to "disregard the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic."  *Payton*, 445 U.S. at 601.  The officers are not entitled to qualified immunity on Bonivert's warrantless entry claim because it

was clearly established law, as of 2012, that neither consent, the emergency aid exception, nor the exigency exception justified the officers' warrantless entry.

### D. INTEGRAL PARTICIPATION

The final issue we address with respect to Bonivert's unlawful entry claim is whether the County Deputies Gary and Joseph Snyder are liable for Combs' decision to enter Bonivert's home without a warrant.

An officer can be held liable for a constitutional violation only when there is a showing of "integral participation" or "personal involvement" in the unlawful conduct, as opposed to mere presence at the scene. *Jones v. Williams*, 297 F.3d 930, 935–36 (9th Cir. 2002). As we held in *Boyd v. Benton County*, 374 F.3d 773 (9th Cir. 2004), "integral participation does not require that each officer's actions themselves rise to the level of a constitutional violation." *Id.* at 780. Rather, we have recognized that officers who provide armed backup, stand at the door with a gun while other officers conduct a search inside an apartment, and participate in the search operation are integral participants. *See id.*; *Melear v. Spears*, 862 F.2d 1177, 1186 (5th Cir. 1989) (holding that an officer who was a "full, active participant in the [unconstitutional] search, not a mere bystander," was liable for Fourth Amendment violation).

The County points to no basis for its suggestion that the deputies' knowledge of the senior officer's investigation, rather than their own actions, dictates whether they were integral participants. Here, the deputies developed a plan of entry with Combs and Purcell, provided armed backup to Combs as he broke into Bonivert's back door, and entered the home on Combs' heels. Viewing the facts in the light most favorable to Bonivert, the deputies were not bystanders

but integral participants in the unlawful entry and are not entitled to qualified immunity.

## III.    FOURTH AMENDMENT EXCESSIVE FORCE CLAIM

We next consider whether the officers were entitled to qualified immunity on Bonivert's excessive force claim.

### A.  CLEARLY ESTABLISHED RIGHT

Excessive use of force in effectuating a seizure violates the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386, 388 (1989).  As with the unlawful entry claim, we judge the reasonableness of the use of force from the perspective of a reasonable officer at the scene, rather than in hindsight. *Ryburn*, 565 U.S. at 477.

The instance of force at issue on appeal is Combs' use of his taser in "drive-stun" mode inside Bonivert's home.[10]  In *Mattos*, we recognized that use of a taser in drive-stun mode on a person who "actively resisted arrest," but posed no "immediate threat to the safety of the officers or others," constituted excessive force.  661 F.3d at 445–46.  The events of this case took place in 2012, the year after we decided *Mattos*.  The constitutional right was clearly established for qualified immunity purposes.

### B.  VIOLATION OF CONSTITUTIONAL RIGHT

Whether an officer used excessive force is analyzed under an "objective reasonableness" standard, which

---

[10] Bonivert does not appear to argue that Combs' initial deployment of his taser in dart mode—which was ultimately ineffective—constituted excessive force.

requires balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 395–96 (citation and internal quotation marks omitted).

The district court found that Bonivert stated a claim for excessive use of force, but that governmental interests in officer safety, investigating a possible crime, and controlling an interaction with a potential domestic abuser outweighed the intrusion upon Bonivert's rights. In reaching this conclusion, the court improperly "weigh[ed] conflicting evidence with respect to . . . disputed material fact[s]." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987); *see also Saucier*, 533 U.S. at 201. The Supreme Court has cautioned that attempting to decide excessive force cases at summary judgment requires courts to "slosh our way through the factbound morass of 'reasonableness,'" with predictably messy results. *See Scott v. Harris*, 550 U.S. 372, 383 (2007). That is precisely what happened when the district court granted summary judgment. Once the officers broke the windowpane and unlocked the back door, a chaotic and confusing scene unfolded, generating equally confusing and chaotic evidence.

To begin, based on the taser video, the district court concluded that Bonivert appeared to move beyond the threshold of the door towards the officers in a manner that caused them to reasonably view Bonivert as a threat, which in turn justified deployment of the tasers in dart mode and the officers' forced entry into the home. The two seconds of video that depict Bonivert's retreat are inconclusive, especially since the shaky footage comes from a taser. But the video starts with Bonivert standing at what appears to be

the threshold of the door and moving backwards. The footage does not show whether prior to the start of the video, Bonivert had been advancing towards the officers, or whether Bonivert had opened the door and stood at its threshold without making further movements in the officers' direction. Additionally, Combs testified that at the time he deployed his taser, Bonivert was not outside his house. Bonivert said that he was standing on the threshold of the door, with "the majority of [his] body" in the house. Bonivert repeatedly denied that he advanced upon the officers at any point after he opened the door, stating: "I had just separated myself from a hostile environment [and] I was trying to avoid another one."

The district court decided that the officers' tackling of Bonivert and the repeated use of tasers in drive-stun mode was warranted based on the following disputed facts: Bonivert attacked Combs; Bonivert screamed at the officers and yelled profanities; and Bonivert continued to struggle and failed to obey the officers' commands.

Each of these conclusions was based on conflicting testimony, and drew upon the officers' version of events rather than Bonivert's testimony. In the taser video, both Bonivert and the officers can be heard yelling amidst the sound of taser deployments, and Bonivert can be heard sobbing near the end of the video. But the video does not show what happened following Combs' forcible entry and whether Bonivert was physically resisting arrest. Bonivert testified that after Combs threw him to the back of the room, he stood up, but did not attempt to fight the officers. When asked if he resisted arrest, Bonivert stated that he "tried distancing [him]self" but that "the entire time being Tased for prolonged periods of time," he had "no muscle movements" and "[h]ardly an ability to speak." Bonivert

denies resisting arrest, while the officers deny that Bonivert posed no immediate threat to their safety.

Taken in the light most favorable to Bonivert, the evidence reflects that Bonivert remained inside the home at all times; that Bonivert did not threaten or advance toward the officers; that Bonivert posed no immediate threat to the officers; that Combs threw Bonivert across the back room; that Bonivert did not resist arrest; and that Combs tasered Bonivert several times in drive-stun mode notwithstanding Bonivert's compliance.  The evidence does not justify the district court's conclusion that "no reasonable jury could find the use of force within the home excessive."

To be sure, the reasonableness inquiry in the context of excessive force balances "intrusion[s] on the individual's Fourth Amendment interests" against the government's interests.  *Graham*, 490 U.S. at 396 (citation and internal quotation marks omitted).  But in weighing the evidence in favor of the officers, rather than Bonivert, the district court unfairly tipped that inquiry in the officers' favor.  *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993) ("[T]he determination of what conduct underlies the alleged violation—what the officer and claimant did or failed to do—is a determination of fact.").  Thus, genuine issues of fact "prevent[] a determination of qualified immunity at summary judgment [such] that the case must proceed to trial."  *See id.*

For the foregoing reasons, we REVERSE the district court's grant of summary judgment on qualified immunity grounds on the Fourth Amendment claims for unlawful entry and excessive force, and REMAND for proceedings consistent with this opinion.

**REVERSED AND REMANDED.**