Fernando M. Olguin, United States District Judge
Having reviewed and considered the parties' Cross-Motions for Summary Judgment (Dkt. 53, "Joint Br."), filed by plaintiff Jeffrey Goodin ("Goodin" or "plaintiff") and defendants City of Glendora ("City"), Detective Crawford ("Crawford"), Detective Ziino ("Ziino"), Lieutenant Demond ("Demond"), Sergeant Amaro ("Amaro"), Officer Stein ("Stein"), Officer Howell ("Howell"), Sergeant Barrett ("Barrett"), and Sergeant Gold ("Gold") (collectively, "defendants"), and all accompanying briefs and exhibits, the court finds that oral argument is not necessary to resolve the Motions, see Fed. R. Civ. P. 78 ; Local Rule 7-15; Willis v. Pac. Mar. Ass'n, 244 F.3d 675, 684 n. 2 (9th Cir. 2001), and concludes as follows.
INTRODUCTION
The operative complaint, the First Amended Complaint ("FAC"), asserts claims under 42 U.S.C. § 1983[1] for: (1) unreasonable search and seizure; (2) excessive force; (3) conspiracy to violate civil rights; and (4) municipal liability pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). (See Dkt. 21, FAC at ¶¶ 19-44). Plaintiff dismissed claims (2) and (3), leaving two § 1983 claims for unlawful entry and Monell liability, and a state claim for violation of California's Public Records Act ("CPRA"), Cal. Gov. Code §§ 6250, et seq. (See Dkt. 21, FAC at ¶¶ 45-51; Dkt. 69, *977 Court's Order of July 20, 2018). The parties both seek summary judgment with respect to plaintiff's two remaining § 1983 claims. (See Dkt. 53, Joint Br. at 21-27 & 49-43). In addition, defendants seek summary judgment with respect to plaintiff's CPRA claim. (See id. at 43-45).
STATEMENT OF FACTS [2]
On May 28, 2015, at approximately 9:00 a.m., police officers in unmarked cars began surveillance of Jeffrey Goodin's residence, located on Big Dalton Avenue in La Puente, California ("Dalton residence").[3] (See Dkt. 53-1, Joint Statement of Uncontroverted Facts ("SUF") at P1 & P3; Dkt. 53-6, Joint Evidentiary Appendix ("Joint App'x"), Exhibit ("Exh.") 10, Google Maps Photo of Dalton residence; Dkt. 53-7, Exh. 15, Deposition of Cpl. Timothy Crawford ("Crawford Depo.") at 41, 51, 55, 99-100; Dkt. 53-10, Exh. 18, Declaration of Jeffrey Goodin ("Goodin Decl.") at ¶ 3). The officers present included defendants Crawford, Ziino, Stein, and Howell, and, at some point, supervising officers Amaro and Demond arrived. (See Dkt. 53-1, SUF at P4 & P17; Dkt. 53-7, Crawford Depo. at 39-40 & 50).
Defendants were watching the Dalton residence because they had received information from a confidential informant ("CRI-1") on May 13, 2015, that plaintiff was transporting and selling methamphetamine from this residence. (See Dkt. 54-1, Sealed SUF at P3 & D8; Dkt. 53-7, Crawford Depo. at 41, 51, 55; Dkt. 54-4, Exh. 23, Sealed Declaration of Timothy Crawford ("Sealed Crawford Decl.") at ¶¶ 7-8). CRI-1 had identified the Dalton residence as Goodin's residence and told Crawford that CRI-1 had seen Goodin with methamphetamine during the prior 20 days, that Goodin was selling a large quantity of methamphetamine from the Dalton residence, and that CRI-1 had received large quantities of narcotics from Goodin and had been asked to sell them. (See Dkt. 54-1, Sealed SUF at D10 & D12-D15; Dkt. 54-4, Sealed Crawford Decl. at ¶¶ 7-8). According to Crawford, CRI-1 was a reliable source because CRI-1 had provided information in the past leading to the arrest of suspects for narcotics and weapons violations. (See Dkt. 54-1, Sealed SUF at D8 & D9; Dkt. 54-4, Sealed Crawford Decl. at ¶ 7). Based on the information provided by CRI-1, Crawford began conducting surveillance of the Dalton residence on May 18, 2015. (See Dkt. 54-4, Sealed Crawford Decl. at ¶ 9).
On May 28, 2015, the tenth day of surveillance of the Dalton residence, defendants did not see plaintiff or any cars departing from or arriving to the Dalton residence. (See Dkt. 53-1, SUF at P43-P46; Dkt. 53-7, Crawford Depo. at 47 & 116). Nor did defendants see any drugs being sold from or transported to or from the Dalton residence. (See Dkt. 53-1, SUF at P30-P31; Dkt. 53-7, Crawford Depo. at 46, 105, 108, 109). However, at some point that morning, between 9 a.m. and 1:09 p.m.,[4] Crawford received a call from a confidential *978 informant[5] ("CI"), notifying Crawford that plaintiff was at the house, and that he had two pounds of methamphetamine.[6] (See Dkt. 54-1, Sealed SUF at D23-D24; Dkt. 54-2, Exh. 13, Hobbs Attachment at 1; Dkt. 54-4, Sealed Crawford Decl. at ¶ 10).
Though Crawford knew he needed a search warrant to enter the Dalton residence, he believed there were exigent circumstances to justify a warrantless entry based on his belief that drugs were "potentially" going to be destroyed or transported from the Dalton residence. (See Dkt. 53-1, SUF at P15 & P16; Dkt. 53-7, Crawford Depo. at 42; Dkt. 54-4, Sealed Crawford Decl. at ¶ 11). Therefore, at about 1:09 p.m., the six officers[7] present entered the Dalton residence - without a warrant or consent - through the closed but unlocked front door, without knocking and with guns drawn. (See Dkt. 53-1, SUF at P19-P22 & P26; Dkt. 53-7, Crawford Depo. at 79-81, 97, 102, 146-47). Upon entering, Crawford announced, "Glendora Police Department. Search warrant. Demand Entry."[8] (See Dkt. 53-1, SUF at P23; Dkt. 54-2, Hobbs Attachment at 2; Dkt. 53-7, Crawford Depo. at 147; Dkt. 53-4, July 10, 2015 Incident Report at ECF 1464).
After entering the Dalton residence without a warrant, defendants went through the house and cleared it room by room. (See Dkt. 53-1, SUF at P53; Dkt. 53-7, Crawford Depo. at 123). When they approached plaintiff near his bedroom, the bedroom furthest from the front door, their guns were pointed at him.[9] (See Dkt. 53-1, SUF at P54; Dkt. 53-10, Goodin Decl. at ¶ 6; Dkt. 53-7, Crawford Depo. at 123). Defendants detained and handcuffed plaintiff, (see Dkt. 53-1, SUF at P56; Dkt. 53-10, Goodin Decl. at ¶ 6; Dkt. 53-7, Crawford Depo. at 123), and Crawford left the Dalton residence and returned to the Glendora Police Station to prepare a search warrant application. (See Dkt. 53-1, SUF at P57; Dkt. 53-7, Crawford Depo. at 58 & 122; Dkt. 54-4, Sealed Crawford Decl. at ¶ 14).
*979 At 3:14 p.m., approximately two hours after defendants entered the Dalton residence without a warrant, a state court judge signed a search warrant with a Hobbs Attachment,[10] which was sealed to protect the confidentiality of the CI. (See Dkt. 53-1, SUF at P54; Dkt. 54-4, Sealed Crawford Decl. at ¶ 14; Dkt. 53-3, Exh. 3, Search Warrant Affidavit). After obtaining the warrant, Crawford returned to the Dalton residence and defendants proceeded to search the house. (See Dkt. 54-4, Sealed Crawford Decl. at ¶ 16). Defendants found Norco pills stashed in the cat litter box in plaintiff's bedroom, which plaintiff admitted that he had hidden there. (See Dkt. 53-1, SUF at D48; Dkt. 53-17, Goodin Depo. at 42-43). They also found a cell phone that plaintiff had hidden in a fish tank.[11] (See Dkt. 53-17, Goodin Depo. at 64 & 87).
In the bedroom of plaintiff's roommate, defendants found a bag with a silver scale, a plastic grocery bag with methamphetamine, four quart-sized baggies, and a bottle with about a dozen individually packaged baggies of methamphetamine. (See Dkt. 53-1, SUF at P64; Dkt. 53-4, July 10, 2015 Incident Report at 1465-66; Dkt. 53-7, Crawford Depo. at 157). These items were later tested for DNA. (See Dkt. 53-1, SUF at P66; Dkt. 53-4, July 10, 2015 Incident Report at ECF 1466; Dkt. 53-5, Exh. 4, DNA Analysis Report at ECF 1484-89; Dkt. 53-7, Crawford Depo. at 152). The test results were negative for plaintiff, and positive for plaintiff's roommate. (See Dkt. 53-5, DNA Analysis Report at ECF 1484-89; Dkt. 53-7, Crawford Depo. at 152, 153, 156, 175-79, 181). Because of the DNA test results, the Glendora Police Department never presented the case to the district attorney to file criminal charges against plaintiff. (See Dkt. 53-1, SUF at P69; Dkt. 53-5, Supplemental Narrative Report at ECF 1489; Dkt. 53-7, Crawford Depo. at 30 & 168-69).
LEGAL STANDARD
Rule 56(a) of the Federal Rules of Civil Procedure authorizes the granting of summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The standard for granting a motion for summary judgment is essentially the same as for granting a directed verdict. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Judgment must be entered "if, under the governing law, there can be but one reasonable conclusion as to the verdict." Id.
The moving party has the initial burden of identifying relevant portions of the record that demonstrate the absence of a fact or facts necessary for one or more essential elements of each cause of action upon which the moving party seeks judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (" Celotex"). If the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."
*980 Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1102-03 (9th Cir. 2000).
If the moving party has sustained its burden, the burden then shifts to the nonmovant to identify specific facts, drawn from materials in the file, that demonstrate that there is a dispute as to material facts on the elements that the moving party has contested. See Celotex, 477 U.S. at 324, 106 S.Ct. at 2553 ; Anderson, 477 U.S. at 256, 106 S.Ct. at 2514 (holding that a party opposing a properly supported motion for summary judgment "must set forth specific facts showing that there is a genuine issue for trial.").[12] A factual dispute is material only if it affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth. SEC v. Seaboard Corp., 677 F.2d 1301, 1306 (9th Cir. 1982). Summary judgment must be granted for the moving party if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322, 106 S.Ct. at 2552 ; see Anderson, 477 U.S. at 252, 106 S.Ct. at 2512 (parties bear the same substantive burden of proof as would apply at a trial on the merits).
In determining whether a triable issue of material fact exists, the evidence must be considered in the light most favorable to the nonmoving party. See Barlow v. Ground, 943 F.2d 1132, 1134 (9th Cir. 1991), cert. denied, 505 U.S. 1206, 112 S.Ct. 2995, 120 L.Ed.2d 872 (1992). However, summary judgment cannot be avoided by relying solely on "conclusory allegations [in] an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990) ; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (more than a "metaphysical doubt" is required to establish a genuine issue of material fact). "The mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to survive summary judgment; "there must be evidence on which the [fact finder] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S.Ct. at 2512.
DISCUSSION
I. WARRANTLESS ENTRY.
Plaintiff seeks summary judgment on his unlawful entry claim on the basis that defendants lacked an exigency to enter his home without a warrant. (See Dkt. 53, Joint Br. at 1). Defendants assert the right to qualified immunity as to this claim. (See id. at 2-3).
"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231, 129 S.Ct. 808, 815, 172 L.Ed.2d 565 (2009) (internal quotation marks omitted). "[I]t protects all but the plainly incompetent or those who knowingly violate the law." Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S.Ct. 2074, 2085, 179 L.Ed.2d 1149 (2011) (" al-Kidd") (internal quotation marks omitted).
*981 The qualified immunity analysis involves two distinct steps, determining: (1) whether the facts alleged by plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was "clearly established" at the time of defendant's alleged misconduct. Pearson, 555 U.S. at 232, 129 S.Ct. at 816 ; Sandoval v. Las Vegas Metro. Police Dep't, 756 F.3d 1154, 1160 (9th Cir. 2014), cert. denied, --- U.S. ----, 135 S.Ct. 1401, 191 L.Ed.2d 360 (2015). Both prongs entail questions of law that the court may address in either order. See Pearson, 555 U.S. at 236, 129 S.Ct. at 818.
A. Violation of Constitutional Right.
The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "[S]earches and seizures inside a home without a warrant are presumptively unreasonable." Hopkins v. Bonvicino, 573 F.3d 752, 773 (9th Cir. 2009), cert. denied, 559 U.S. 1048, 130 S.Ct. 2342, 176 L.Ed.2d 561 (2010) (internal citation omitted); Payton v. New York, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980) (finding warrantless searches of the home or area surrounding the home "presumptively unreasonable"). "The presumption, however, is not irrebuttable. There are two general exceptions to the warrant requirement for home searches: exigency and emergency." Hopkins, 573 F.3d at 763 (internal quotation marks omitted). "These exceptions ... are narrow and their boundaries are rigorously guarded." Sandoval, 756 F.3d at 1161 (internal quotation marks omitted); Hopkins, 573 F.3d at 763 (same). Outside of these two narrow exceptions, "a warrantless entry ... is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within." Payton, 445 U.S. at 587-88, 100 S.Ct. at 1381 ; see United States v. Johnson, 256 F.3d 895, 907 (9th Cir. 2001) (en banc ) (per curiam ) ("No amount of probable cause can justify a warrantless search or seizure absent exigent circumstances.") (internal quotation marks and alteration omitted); see also LaLonde v. Cty. of Riverside, 204 F.3d 947, 956 (9th Cir. 2000) (collecting cases and describing this rule as "well settled constitutional law").
The government has the "heavy burden," United States v. Alvarez, 810 F.2d 879, 881 (9th Cir. 1987), of showing that exigent circumstances made the warrantless entry imperative. See United States v. Gooch, 6 F.3d 673, 679 (9th Cir. 1993) ; United States v. Driver, 776 F.2d 807, 810 (9th Cir. 1985) ("Since a warrantless arrest is presumptively unreasonable, we have recognized that the government bears a heavy burden of demonstrating that exceptional circumstances justified a departure from the normal procedure of obtaining a warrant."). To meet its burden, the government must "demonstrate specific and articulable facts[.]" Driver, 776 F.2d at 810 (internal quotation marks omitted). "[T]his burden is not satisfied by leading a court to speculate about what may or might have been the circumstances." Id.; see Arkansas v. Sanders, 442 U.S. 753, 759-60, 99 S.Ct. 2586, 2591, 61 L.Ed.2d 235 (1979), abrogated on other grounds by California v. Acevedo, 500 U.S. 565, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) ("[B]ecause each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment, the few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and the burden is on those seeking the exemption to show the need for it."). "Moreover, because exigent circumstances *982 necessarily imply insufficient time to obtain a warrant, the government must also show that a warrant could not have been obtained in time." United States v. Lindsey, 877 F.2d 777, 781 (9th Cir. 1989).
Here, "[b]ecause there is no dispute that the officers failed to obtain a warrant before entering [plaintiff's] home, the entry was presumptively unreasonable." Bonivert v. City of Clarkston, 883 F.3d 865, 873 (9th Cir. 2018). Defendants assert that the entry was nevertheless justified by the exigent circumstances exception to the warrant requirement because they "had good reason to fear that, unless restrained, Goodin would destroy the drugs before they could return with a warrant." (Dkt. 54, Sealed Joint Br. at 32). According to defendants, "[f]earing that [the CI] would call Goodin and tip him off, [they] reasonably concluded that Goodin, consequently suspecting an imminent search, would, if given the chance, get rid of the drugs fast." (Id. ). Finally, defendants claim that they "had prior knowledge of Goodin destroying illegal narcotics while conducting a search warrant." (Id. ). Defendants' assertions are unpersuasive.
The exigent circumstances exception applies only where officers "have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is necessary to prevent ... the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." Hopkins, 573 F.3d at 763 (internal quotation marks omitted); United States v. McConney, 728 F.2d 1195, 1199 (9th Cir.) (en banc ), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984) (same).
Defendants have not put forth any evidence to raise an issue of fact as to whether any such circumstances were present in this case. As an initial matter, it is undisputed that, based upon a tip from an informant Crawford considered reliable, defendants had been watching the Dalton residence for ten days prior to the incident in question. (See Dkt. 54-1, Sealed SUF at D8-D9 & D16; Dkt. 54-4, Sealed Crawford Decl. at ¶¶ 7 & 9; Dkt. 54-2, Hobbs Attachment at 1). It is also undisputed that between 9:00 a.m. on May 28, 2015, when defendants arrived at the Dalton residence, and 1:09 p.m., when they entered the home without a warrant, defendants did not see any activity or have any evidence that drugs were going to be destroyed or transported from the Dalton residence. (See Dkt. 53-1, SUF at P43-P47; Dkt. 53-7, Crawford Depo. at 47-48, 116, 121; see, generally, Dkt. 54-2, Hobbs Attachment (no mention of observed evidence of drug transportation); Dkt. 53-4, July 10, 2015 Incident Report at ECF 1464 (same)).[13] Indeed, Crawford testified *983 that he did not even know the specific method with which such drug transportation would occur. (See Dkt. 53-1, SUF at P48; Dkt. 53-7, Crawford Depo. at 144-45).
Further, defendants did not put forth any specific and articulable facts supporting Crawford's belief that the CI he spoke to on May 28, 2015, was going to call Goodin and "tip him off" that the CI had revealed to law enforcement that Goodin had drugs in his possession. That is, assuming the CI that Crawford spoke to on May 28, 2015, was a different confidential informant than the one he spoke to on May 13, 2015, see supra at n. 5, there are no specific and articulable facts to support Crawford's belief that the CI was going to contact Goodin and tip him off, so as to trigger a reasonable likelihood that Goodin would imminently destroy or transport the evidence.[14] (See, generally, Dkt. 54-2, Hobbs Attachment at 1); see, e.g., United States v. George, 883 F.2d 1407, 1414-15 (9th Cir. 1989) ("The government apparently argues that by the time the officers could have obtained an arrest warrant [plaintiff] would have grown suspicious and therefore would have resorted to desperate measures. But we cannot measure the exigency of the circumstances by what might have happened in the interim period."). Defendants did not put forth any evidence indicating that the CI had tipped off other suspects in the past, let alone that the CI would have any incentive to do so in this case. (See, generally, Dkt. 53, Joint Br.). Moreover, it makes no sense that Crawford believed the CI was reliable enough to trust the CI's tip that Goodin was inside his home with drugs in his possession, yet so untrustworthy that Crawford believed the CI would call Goodin and let Goodin know that the CI had reported that very fact to police. As for defendants' allegations that Goodin had destroyed evidence in the past, those allegations are unsupported - indeed, they are contradicted - by the evidence in record. (See Dkt. 53-16, Exh. 9, November 1, 2013, Incident Report at ECF 1678-80). In any event, even if Goodin had destroyed evidence in the past, without a tip that police officers were coming, he would have no reason to destroy the evidence in this case.[15]
In addition, defendants' reliance on the information provided by CRI-1, (see Dkt. 53-4, July 10, 2015 Incident Report at ECF 1464), does not support a finding of exigent circumstances. Defendants contend that the information provided by the first confidential "reliable" informant gave them "probable cause to believe that Goodin's home contained evidence of a crime and contraband, namely, unlawful drugs[.]"
*984 (Dkt. 54, Sealed Joint Br. at 32). But if, as defendants contend, the information provided by the CRI-1 was sufficient to establish probable cause, see Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983) (defining probable cause as "a fair probability that contraband or evidence of a crime will be found in a particular place"), then defendants could have and should have simply sought a search warrant during the ten days they were watching the Dalton residence. See U.S. Const. Amend. IV ("[N]o Warrants shall issue, but upon probable cause[.]"). Defendants do not explain why they did not seek a search warrant on the basis of CRI-1's information. (See, generally, Dkt. 54, Sealed Joint Br. at 11-12 & 31-34). The court "recognize[s] that the officers were not bound to seek warrants as soon as they established probable cause. But this does not foreclose consideration of such decisions in determining whether the exigency in fact existed and whether it was created by the actions of the officers." United States v. Calhoun, 542 F.2d 1094, 1102 (9th Cir. 1976), cert. denied, 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977) (citation omitted).
The fear that a suspect will destroy or remove evidence can create exigent circumstances, but only where the officers have proof - beyond mere speculation - that there is "a substantial likelihood that discovery [by the suspect of the officers' impending raid] had already occurred or was about to occur." Driver, 776 F.2d at 811 ; see Gooch, 6 F.3d at 679 ("Exigent circumstances are present when a reasonable person would believe that entry was necessary to prevent ... the destruction of relevant evidence[.]") (internal quotation marks and alternations omitted); see, e.g., United States v. Suarez, 902 F.2d 1466, 1468 & n. 2 (9th Cir. 1990) (no exigent circumstances where government failed to show "specific evidence" that failure of one co-conspirator to return to other co-conspirator's apartment would put the second on notice that something had gone wrong, allowing him to destroy evidence before the agents could obtain a warrant, explaining that "mere[ ] speculat[ion] that cocaine was present and that there was an imminent danger it would be destroyed" was not enough to meet government's burden). Here, however, defendants have not put forth "particularized evidence" to suggest that Crawford's fear that evidence would be destroyed or transported was reasonable, or had any basis in fact whatsoever.[16] (See, generally, Dkt. 54, Sealed Joint Br. at 13 & 31-34).
Defendants' claim of exigency is further undermined by their failure to "show that a warrant could not have been obtained in time." Lindsey, 877 F.2d at 781 ; see Alvarez, 810 F.2d at 883 ("[O]ur decision here ... requires the government either to attempt, in good faith, to secure a warrant or to present evidence explaining why a telephone warrant was unavailable or impractical.") (footnote omitted). There is no *985 evidence to suggest that anything at the scene changed between the time the officers arrived at the Dalton residence, at 9:00 a.m. on May 28, 2015, and 1:09 p.m. that day, when Crawford decided it was necessary to enter the residence without a warrant. See, e.g., United States v. Blake, 632 F.2d 731, 734 (9th Cir. 1980) (noting, in finding no exigent circumstances, that the arrest "was preceded by approximately an hour of surveillance"). Further, there is no dispute that Crawford was aware that he could call a judge to get a telephonic search warrant, and that he did not do so. (See Dkt. 53-1, SUF at P50-P51; Dkt. 53-7, Crawford Depo. at 52 & 59). Crawford's only explanation for not seeking a telephonic search warrant - that he did not think it was "warranted ... at that time," (see id.) - was not justified by the circumstances before Crawford and was otherwise insufficient to satisfy his constitutional obligations under the Fourth Amendment. See, e.g., Blake, 632 F.2d at 734 (noting, in finding no exigent circumstances, that "the FBI agent who made the arrest testified that he knew that a warrant could have been obtained by telephone but, without discussing the decision with anyone and perhaps on the good faith belief that a warrant was not necessary, decided to make the arrest without a warrant"); Alvarez, 810 F.2d at 884 (exigent circumstances did not justify warrantless arrest for drug crime where, although officers had time to request warrant telephonically, they did not make "the slightest effort" to do so). In addition, there were six officers present, likely a sufficient number such that "instead of entry, [defendants] might have maintained surveillance while a warrant was sought." Calhoun, 542 F.2d at 1102 (number of officers militated against exigent circumstances, where there were eight officers). Yet, in spite of the lack of change in observable circumstances at the Dalton residence and the presence of multiple officers, defendants did not "attempt, in good faith, to secure a warrant[,]" or "present evidence explaining why a telephone warrant was unavailable or impractical." Alvarez, 810 F.2d at 882-83 ; see, e.g., id. (finding no exigent circumstances justifying warrantless entry of hotel room and arrest of defendant, where "[t]he agents had a minimum of 90 minutes and sufficient time to discuss the case fully with personnel of the U.S. Attorney's office[,]" and the government presented no evidence "why a telephone warrant was unavailable or impracticable"); Blake, 632 F.2d at 734 (no exigent circumstances where "the acquisition of a warrant would not have presented any great difficulty nor would have entailed the loss of any substantial amount of time"). Under the circumstances, defendants could have, "without great difficulty, maintain[ed] surveillance of the premises and either wait[ed] to effectuate a valid public arrest when [Goodin] emerge[d] or [sought a search] warrant from a neutral and detached magistrate." George, 883 F.2d at 1413-14 (internal citations omitted).
"An exigency is an emergency so pressing that a warrant cannot be obtained. Only where police must react immediately may they disregard the warrant requirement." United States v. Shephard, 21 F.3d 933, 938 (9th Cir. 1994). Here, the facts and evidence put forth by defendants are "fundamentally inconsistent with any true exigency[.]" Alvarez, 810 F.2d at 882 ; see, e.g., Gooch, 6 F.3d at 679 (upholding trial court's determination that, at time of search, law enforcement could not have had reasonable belief that exigent circumstances existed because all was quiet and it appeared that any relevant persons were sleeping). "The totality of the circumstances, viewed at the moment the police decided to enter [plaintiff's home], do not *986 warrant a finding of exigency." George, 883 F.2d at 1415. Defendants have not provided any specific and articulable facts to support Crawford's belief that the officers needed to act immediately to prevent the imminent destruction or removal of evidence. To allow an officer's unreasonable assumption that a confidential informant was going to tip off the suspect to suffice for showing exigent circumstances would render the warrant requirement toothless in any case involving a confidential informant. See, e.g., Calhoun, 542 F.2d at 1102 (no exigent circumstances without an indication in the record that "it was more likely [that the suspect would hear of the impending raid] here than in any case where there are two or more suspects and all are not arrested at once"); Shotland v. City of Torrance, 2004 WL 3187352, *10 n. 22 (C.D. Cal. 2004) ("[I]t seems at the very least unreasonable to believe, as Defendants would have the Court believe here, that any time a member of a drug conspiracy ... is able to telephone the next co-conspirator up the chain, that every member of that conspiracy ... will be so concerned with the intervention of law enforcement at a low level of the conspiracy, that every member of the conspiracy will dispose of any and all contraband immediately."); see also United States v. Allard, 600 F.2d 1301, 1304 (9th Cir. 1979) (entry "cannot be justified solely because an [officer] knows that there is contraband on the premises"). "[B]ecause of the danger that exceptions pose for fourth amendment guarantees, [the court is] most unwilling to excuse the government's failure to seek a warrant in cases where no necessity for immediate action can be demonstrated." Alvarez, 810 F.2d at 883-84 (internal quotation marks omitted).
In short, defendants have not met their "heavy burden of demonstrating that exceptional circumstances justified a departure from the normal procedure of obtaining a warrant." Driver, 776 F.2d at 810. As such, defendants' warrantless entry into the Dalton residence violated plaintiff's Fourth Amendment rights against unreasonable search and seizure.[17] See United States v. Burleigh, 414 F.Appx. 77, 78 (9th Cir. 2011) ("The warrantless entry and seizure were unconstitutional because they were not justified by exigent circumstances.").
B. "Clearly Established" Law.
Having determined that a constitutional right was violated, the court turns next to the second prong of the qualified immunity analysis. "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, --- U.S. ----, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) (per curiam ) (internal quotation marks omitted). In determining whether a right is clearly established, there does not need to be a "case directly on point, but existing precedent must have placed the *987 ... constitutional question beyond debate." al-Kidd, 563 U.S. at 741, 131 S.Ct. at 2083 ; see Thompson v. Rahr, 885 F.3d 582, 587 (9th Cir. 2018) ("For a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate, such that 'every' reasonable official, not just 'a' reasonable official, would have understood that he was violating a clearly established right.") (emphasis and some internal quotation marks omitted); District of Columbia v. Wesby, --- U.S. ----, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) (" Wesby") ("The rule's contours must be so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted.") (internal quotation marks omitted). "[T]he dispositive question is whether the violative nature of particular conduct is clearly established." Thompson, 885 F.3d at 587. In the context of a warrantless entry into a person's home, the clearly established law must resolve "whether the circumstances with which [the officer] was confronted ... constitute[d exigent circumstances]." Mullenix, 136 S.Ct. at 309.
However, "general statements of the law are not inherently incapable of giving fair and clear warning to officers[.]" White v. Pauly, --- U.S. ----, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (per curiam ) (internal quotation marks omitted). In some circumstances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful[.]" United States v. Lanier, 520 U.S. 259, 271, 117 S.Ct. 1219, 1227, 137 L.Ed.2d 432 (1997) (internal quotation marks omitted); see Wesby, 138 S.Ct. at 581 ("[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances.") (internal quotation marks and citations omitted). The court is "particularly mindful of this principle in the Fourth Amendment context, where the constitutional standard - reasonableness - is inevitably a fact-intensive inquiry. After all, if qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their reasonable violations of the Fourth Amendment." Bonivert, 883 F.3d at 872-73 (internal quotation marks and brackets omitted).
"It is axiomatic that the physical entry of the home is the chief evil against which the wording of the Fourth Amended is directed." Welsh v. Wisconsin, 466 U.S. 740, 748, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). It is also well-settled, clearly established Fourth Amendment law that warrantless searches of the home or the curtilage surrounding the home are "presumptively unreasonable." Payton, 445 U.S. at 586, 100 S.Ct. at 1380 ; United States v. Struckman, 603 F.3d 731, 738 (9th Cir. 2010) ("The presumptive protection accorded people at home extends to outdoor areas traditionally known as curtilage - areas that, like the inside of a house, harbor the intimate activity associated with the sanctity of a person's home and the privacies of life.") (internal quotation marks and alterations omitted).
"Among constitutional rules, few are as well established, frequently applied, and familiar to police officers as the warrant requirement and its exceptions." Bonivert, 883 F.3d at 873 ; see Sandoval, 756 F.3d at 1161 ("[I]t is clearly established Federal law that the warrantless search of a dwelling must be supported by probable cause and the existence of exigent circumstances[.]") (internal quotation marks omitted); Struckman, 603 F.3d at 739 (same).
*988 The exigent circumstances exception allows officers to enter a home without a warrant only "if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent ... the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.' " Hopkins, 573 F.3d at 763 (quoting McConney, 728 F.2d at 1199 ); see Driver, 776 F.2d at 810 ("[E]xigent circumstances ... justify[ ] a warrantless entry: '[w]hen police officers, acting on probable cause and in good faith reasonably believe from the totality of circumstances that (a) evidence or contraband will imminently be destroyed or (b) the nature of the crime or character of the suspect(s) pose a risk of danger to the arresting officers or third persons.' ") (quoting United States v. Kunkler, 679 F.2d 187, 191-92 (9th Cir. 1982) ).
In addition, it is clearly established law that where officers cite fear that evidence will be destroyed as a basis to show exigent circumstances, "[m]ere speculation regarding the presence of drugs on a premises and the danger of their destruction is not sufficient to show exigent circumstances." United States v. Tarazon, 989 F.2d 1045, 1049 (9th Cir.), cert. denied, 510 U.S. 853, 114 S.Ct. 155, 126 L.Ed.2d 116 (1993) ; see Allard, 600 F.2d at 1304 ("Although the threatened destruction of evidence may create exigent circumstances to justify a warrantless search, ... the search cannot be justified solely because an agent knows that there is contraband on the premises.") (internal citations omitted). Rather, the government must show that the officers had a reasonable belief, based on the totality of the circumstances, that evidence or contraband would be imminently destroyed. See Kunkler, 679 F.2d at 191-92 (exigent circumstances justify a warrantless entry "[w]hen police officers, acting on probable cause and in good faith, reasonably believe from the totality of circumstances that ... evidence or contraband will imminently be destroyed") (collecting cases); see, e.g., Curiel v. Cty. of Contra Costa, 362 F.Appx. 824, 828 (9th Cir. 2010) (reversing district court finding of exigency based on conclusion that "jury could reasonably find that the deputies had no specific facts indicating that Dyleski was an imminent flight risk or that any imminent destruction of evidence by Dyleski or Appellants was likely, given that neither Dyleski nor Appellants had any suspicion of immediate apprehension or the deputies' imminent arrival") (emphasis in original); Shotland, 2004 WL 3187352, at *9 ("With respect to the exigent circumstance of destruction of relevant evidence, two conditions must be met.... The arresting officers must have (1) a reasonable belief that third persons are inside, and (2) a reasonable belief that the third persons are aware of the arrest outside the premises so that they might destroy evidence, escape or jeopardize the safety of the officers or the public.") (internal quotation marks omitted).
As an initial matter, "[t]his is not a case involving such an undeveloped state of the law that qualified immunity is necessary to protect the officers from the special unfairness that results when they are expected to predict the future consequences of constitutional law." Bonivert, 883 F.3d at 873. Rather, this is a case demanding "knowledge of ... basic, unquestioned constitutional rights[.]" Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1001, 43 L.Ed.2d 214 (1975). Here, in spite of the clearly established law requiring officers to have a reasonable belief that evidence will be imminently destroyed and that obtaining a warrant was not possible under the circumstances confronting the *989 officers, defendants entered plaintiff's home without a warrant on the basis of "mere speculation regarding the presence of drugs on [the] premises and the danger of their destruction[,]" and without any attempt to show why obtaining a warrant was impractical. Tarazon, 989 F.2d at 1049 (stating that such proof "is not sufficient to show exigent circumstances"); see Alvarez, 810 F.2d at 883 (holding that officers entering home without warrant must "either ... attempt, in good faith, to secure a warrant or ... present evidence explaining why a telephone warrant was unavailable or impractical"); see also McDonald v. United States, 335 U.S. 451, 456, 69 S. Ct. 191, 193, 93 L.Ed. 153 (1948) ("We cannot be true to [the warrant] requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative."). To the extent defendants were mistaken as to what the law required to justify the warrantless entry into the Dalton residence, the court is persuaded that their mistake was unreasonable. See Bonivert, 883 F.3d at 873-74. In other words, the unlawfulness of defendants' warrantless entry into the Dalton residence was clearly "apparent in light of pre-existing law." San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962, 977 (9th Cir.), cert. denied, 546 U.S. 106, 1126 S.Ct. 796, 163 L.Ed.2d 627 (2005) ("[I]t is not necessary that the alleged acts have been previously held unconstitutional, [in order to determine that a right was clearly established] as long as the unlawfulness [of defendants' actions] was apparent in light of pre-existing law.") (internal quotation marks omitted and second alteration in original).
In addition to being an obvious violation of the bedrock Fourth Amendment principle that warrantless searches of the home or its surrounding curtilage are "presumptively unreasonable" unless an exception to the warrant requirement applies, the violation here was clearly established by factually analogous cases predating the 2015 incident at issue. See Wesby, 138 S.Ct. at 589. For example, in George, the Ninth Circuit considered whether exigent circumstances justified the warrantless entry through the open front door of the apartment of a suspected bank robber by a "stakeout team" of multiple officers. See 883 F.2d at 1410 & 1414-15. The court rejected the government's argument that the warrantless entry was justified by exigent circumstances based on the officers' belief that "by the time the officers could have obtained an arrest warrant Appellant would have grown suspicious and therefore would have resorted to desperate measures." Id. at 1415. The Ninth Circuit stated that "[it] [had] held several times before, on remarkably similar facts, that the police cannot avoid the good faith requirement of attempting to obtain an arrest warrant because of an imagined delay." Id. at 1415. The court found that the record was insufficient for it to conclude "that the officers reasonably believed that [the suspect] either knew or was in substantial danger of learning of his imminent capture[,]" or that "even absent that knowledge[,] immediate entry into [the suspect's residence] was necessary to prevent [the suspect] from either currently endangering lives or currently destroying evidence[.]" Id. at 1414-15.
In Driver, officers had knowledge that a person suspected of possession with intent to distribute narcotics and the narcotics themselves were on the premises, and feared that the person might discover the drugs were actually a "look-alike substance" provided to her by a confidential informant and destroy them. 776 F.2d at 809. The court held that those facts were insufficient to meet the government's "burden *990 of demonstrating exigent circumstances to support a departure from the normal procedure of obtaining a warrant." Id. at 811. "Because of the intrusive nature of a warrantless [entry], the government must demonstrate specific and articulable facts to justify a finding of exigent circumstances, and this burden is not satisfied by leading a court to speculate about what may or might have been the circumstances." Id. at 810 ; see, e.g., Burleigh, 414 F.Appx. at 78 ("On the factors of this case, the police officers'[ ] speculations that there were individuals inside the warehouse who might destroy evidence and that these individuals knew or might be alerted that the warehouse was under surveillance are insufficient to meet the government's burden of proving exigent circumstances.").
Even in cases where a suspect's alleged co-conspirators have been caught, and there is therefore a possibility that the suspect could "hear of the raid" from a co-conspirator,[18] the Ninth Circuit has held that exigent circumstances cannot be established without an indication in the record that "it was more likely [that the suspect would hear of the impending raid] here than in any case where there are two or more suspects and all are not arrested at once." Calhoun, 542 F.2d at 1102. In Calhoun, the court found no exigent circumstances justified the warrantless entry into the apartment of a suspected co-conspirator ("Sheppard") in a heroin importation ring based on previously executed search warrants of several other co-conspirators earlier that day, including the apartment of one co-conspirator who lived in the same building as Sheppard, because there was a lack of evidence to support the officers' speculation that Sheppard would hear of the raid. See id. at 1097 & 1102-03. Similarly, in Alvarez, a drug smuggling case, the Ninth Circuit found no exigent circumstances justified the warrantless entry into a suspected co-conspirator's hotel room after the arrest of another co-conspirator in the same hotel due to a lack of evidence that the former co-conspirator would learn about the arrest of the latter. See 810 F.2d at 882-84. The Ninth Circuit noted that the amount of time that had elapsed between when the agents learned that the suspect was at the hotel and the time they actually arrested him, and the government's failure to present evidence explaining why securing a telephone warrant was impractical, were "fundamentally inconsistent with any true exigency." Id. at 882.
In Suarez, the Ninth Circuit also found that no exigent circumstances justified the officers' entry into the home of a suspected cocaine distribution co-conspirator. 902 F.2d at 1468. The court rejected the government's argument that the failure of one co-conspirator to return to the home of the other co-conspirator following the arrest of the first co-conspirator would put the second on notice that something had gone wrong because the government failed to cite any "specific evidence" that it was standard procedure for one co-conspirator to meet the other immediately after each sale. Id. at 1468 n. 2. The court found no exigent circumstances existed "[b]ecause the agents merely speculated that cocaine was present and that there was an imminent *991 danger that it would be destroyed," and because there was enough time for the officers to seek a warrant before entering the apartment. Id. at 1468. In short, even in cases that involved circumstances (i.e., co-conspirators) where the likelihood of a suspect being "tipped off" of an impending raid was far more objectively likely than the instant case, clearly established law has required specific evidence that the destruction or removal of evidence was imminent and that it was not possible to obtain a warrant. In other words, the officers' warrantless entry here - without any specific and articulable facts to support Crawford's belief that the second CI, despite providing confidential information to Crawford, was going to tip off Goodin of an impending raid - is arguably even more objectively unreasonable than the Fourth Amendment violations identified in the cases above. See, e.g., Estate of Lopez ex rel. Lopez v. Gelhaus, 871 F.3d 998, 1019 (9th Cir. 2017) ("In other words, [defendant's] alleged use of deadly force was more objectively un reasonable than the Fourth Amendment violation identified in George.") (emphasis in original).
In sum, even if the instant violation were not an obvious one, the foregoing cases unambiguously set forth sufficient clearly established law to have put defendants on notice that their particular conduct under the circumstances facing defendants was unconstitutional. As in Driver, Suarez, and Calhoun, the alleged exigent circumstances cited to justify the officers' warrantless entry onto the Dalton residence was the risk that plaintiff, whom defendants suspected of a drug crime, might destroy the evidence or attempt to flee unless the officers entered the premises immediately. See, e.g., Driver, 776 F.2d at 810 ("The government contends that the initial entry and arrest was made without a warrant because the agents were afraid that Panom Driver would destroy the evidence."); Suarez, 902 F.2d at 1468 n. 2 ("The government argues that it was reasonable for the officers to believe that Gonzalez's failure to return to Suarez's apartment after the transaction would put Suarez on notice that something had gone wrong, allowing him to destroy evidence before the agents could obtain a warrant."); Calhoun, 542 F.2d at 1102 ("The government contends that once they had raided Calhoun's apartment there was the distinct possibility that other conspirators would hear of the raid and attempt to flee."). However, as in Alvarez, Suarez, and Calhoun,[19] defendants made no attempt to secure a warrant prior to their unlawful entry, or to provide any justification as to why it would not have been possible to do so under the circumstances here. See, e.g., Alvarez, 810 F.2d at 882-83 ("[W]e are most unwilling to excuse the government's failure to seek a warrant in cases where no necessity for 'immediate action' can be demonstrated."); Suarez, 902 F.2d at 1468 (no exigent circumstances where "the record indicates that the agents could have obtained a warrant to search Suarez's apartment before his arrest"); Calhoun, 542 F.2d at 1102 (noting that it was "not apparent" why officers had not obtained warrant). Yet, the circumstances of this case - that there were *992 multiple officers present as in George; and that the officers had been staking out the residence for hours before their warrantless entry as in Alvarez - indicate that defendants had more than sufficient time to secure a warrant. See, e.g., Alvarez, 810 F.2d at 881-82 (fact that officers waited between 90 minutes and two hours between the time they "learned where [the suspect] was waiting until the time they actually arrested him at that location," indicated that they had time to secure a telephonic warrant); George, 883 F.2d at 1413 (fact that there were eight officers in the area suggested that "instead of entry, they might have maintained surveillance while a warrant was sought"). Moreover, the fact that defendants contend, based on information provided by CRI-1 prior to May 28, 2015, that there was "probable cause to believe that Goodin's home contained evidence of a crime and contraband, namely, unlawful drugs," (see Dkt. 54, Sealed Joint Br. at 32), undermines any claim that there was no time to get a warrant. In other words, acquiring a warrant here "would not have presented any great difficulty nor would have entailed the loss of any substantial amount of time." Blake, 632 F.2d at 734 (fact that officers "pursued their investigation in a measured and deliberate manner" suggested that they could have obtained a warrant prior to entry).
In addition, while it is possible that the CI could have notified Goodin, just like it was possible that the apprehended co-conspirators in Calhoun, Alvarez, or Suarez, could have alerted the suspects in those cases that their arrest was imminent, Crawford's belief was premised on mere speculation and assumptions, as opposed to any specific facts that discovery of the officers' imminent raid was a "substantial likelihood." Driver, 776 F.2d at 811. In other words, defendants' "assumptions [were] indeed, too speculative as to the likelihood or imminence of the discovery, and not substantial enough to justify the warrantless entry." Id. Simply put, this is a case, like Driver, Calhoun, Alvarez, and Suarez, where, although "it [was] possible that [the suspect] might have discovered" the raid was imminent, "nothing in the record indicates it was more likely here than in any case" involving a confidential informant. See, e.g., Calhoun, 542 F.2d at 1102 (no exigent circumstances where "nothing in the record indicates it was more likely here than in any case where there are two or more suspects and all are not arrested at once") (emphasis added).
The cases outlined above constitute 30 years of case law developing and reinforcing the principles that, to justify a warrantless entry based upon the exigency that the suspect will learn of a pending police raid and destroy evidence, the government must (1) provide proof that there was a "substantial likelihood" the suspect would discover the imminent raid, and (2) demonstrate that the officers made a good faith effort to obtain a warrant, or provide evidence that doing so would have been impractical. See Driver, 776 F.2d at 811 (holding, in 1985, that officers must provide "some proof that ... the removal or destruction of the evidence [was] imminent" in order to justify warrantless entry into plaintiff's home); Alvarez, 810 F.2d at 883 (holding, in 1987, that the "government [must] either ... attempt, in good faith, to secure a warrant or ... present evidence explaining why a telephone warrant was unavailable or impractical"). Such precedent is a "robust consensus of cases of persuasive authority." al-Kidd, 563 U.S. at 742, 131 S.Ct. at 2084. This "clear foundation" of case law, Wesby, 138 S.Ct. at 589, was more than sufficient to give defendants fair notice that the circumstances in this case required that they obtain a warrant before entering plaintiff's home.
*993 Because the court finds "the facts regarding what the officer or Plaintiff actually did" to be undisputed, see LaLonde, 204 F.3d at 953, and the undisputed facts - viewed in their totality - do not support a finding of exigent circumstances, the court grants summary judgment to plaintiff, and denies summary judgment to defendant, on plaintiff's warrantless entry claim.
II. MONELL LIABILITY.
"While local governments may be sued under § 1983, they cannot be held vicariously liable for their employees' constitutional violations." Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1096 (9th Cir. 2013), cert. denied, 571 U.S. 1199, 134 S.Ct. 1292, 188 L.Ed.2d 301 (2014) ; see Velazquez v. City of Long Beach, 793 F.3d 1010, 1027 (9th Cir. 2015) ("[A municipality] cannot be held liable ... on a respondeat superior theory.") (internal quotation marks omitted). "Under Monell, a local government body can be held liable under § 1983 for policies of inaction as well as policies of action." Jackson v. Barnes, 749 F.3d 755, 763 (9th Cir. 2014), cert. denied, -- U.S. ----, 135 S.Ct. 980, 190 L.Ed.2d 835 (2015) ; see Gibson v. Cty. of Washoe, 290 F.3d 1175, 1185 (9th Cir. 2002), overruled on other grounds by Castro v. Cty. of Los Angeles, 833 F.3d 1060, 1076 (9th Cir. 2016) (en banc ) (setting forth two paths that "can lead to the conclusion that a municipality has inflicted a constitutional injury"). "A policy of action is one in which the government body itself violates someone's constitutional rights, or instructs its employees to do so; a policy of inaction is based on a government body's 'failure to implement procedural safeguards to prevent constitutional violations.' " Jackson, 749 F.3d at 763 (quoting Tsao v. Desert Palace, Inc., 698 F.3d 1128, 1143 (9th Cir. 2012) ; see Waggy v. Spokane Cty., 594 F.3d 707, 713 (9th Cir. 2010) (noting that for purposes of Monell liability, "a policy can be one of action or inaction" and in order to state a claim based on inaction, "a plaintiff can allege that through its omissions the municipality is responsible for a constitutional violation committed by one of its employees") (internal quotation and alteration marks omitted).
To challenge a policy of action, a plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997). The policy must be an "official policy" - i.e., an "act[ ] which the municipality has officially sanctioned or ordered" - in other words, a "deliberate choice to follow a course of action ... made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." Pembaur v. Cincinnati, 475 U.S. 469, 480 & 483, 106 S.Ct. 1292, 1298 & 1300, 89 L.Ed.2d 452 (1986) ; see Castro, 833 F.3d at 1075 (same). Under this approach, "[t]he existence of a constitutional injury ... is not dependent on the lawfulness of [the officer's] conduct, but instead turns on the reasonableness of the city's general policy[.]" Chew v. Gates, 27 F.3d 1432, 1440 (9th Cir. 1994), cert. denied 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995) ; see, e.g., id. at 1445 ("[M]unicipal liability need not be predicated on an 'unreasonable' action on [the officer's] part. A jury could conceivably decide ... that although the officer's on-the-scene decision to use canine force was reasonable under the circumstances, the city was nevertheless at fault for providing its officers with dogs trained to bite and seize all concealed suspects regardless of their efforts to surrender."); Gibson, 290 F.3d at 1185 (describing *994 and listing examples of this "direct path to municipal liability").[20]
In inaction cases, "the plaintiff must show, first, that the policy amounts to deliberate indifference to the plaintiff's constitutional right. This requires showing that the defendant was on actual or constructive notice that its omission would likely result in a constitutional violation." Jackson, 749 F.3d at 763 (internal quotation marks, citations, and alterations omitted); Tsao, 698 F.3d at 1145 (same). Second, the plaintiff must show that the policy caused the violation in the sense that the municipality could have prevented the violation with an appropriate policy." Jackson, 749 F.3d at 763 (internal quotation marks, citations, and alterations omitted); Tsao, 698 F.3d at 1143 (same).
Here, plaintiff brings his Monell claim under both paths, arguing that the City violated his constitutional rights by maintaining an unconstitutional policy and by failing to adequately train its police officers. (See Dkt. 53, Joint Br. at 27-30).
A. Policy Re: False Warrant Announcement.
Under the first path, plaintiff asserts that the City violated his constitutional rights by maintaining a "policy of entering homes without a warrant while yelling 'Glendora Police, Search Warrant, Demand Entry.' " (Dkt. 53, Joint Br. at 2). Plaintiff points to Crawford's uncontested testimony that he was trained to enter a home and yell, "search warrant, demand entry," even when he did not, in fact, have a search warrant. (See id. at 28; Dkt. 53-1, SUF at P71, P72, P74; Dkt. 53-7, Crawford Depo. at 148, 191, 195). According to plaintiff, Crawford's testimony is consistent with Glendora Police Department practice. (See Dkt. 53-1, SUF at P73; Dkt. 53-7, Crawford Depo. at 193).
"In considering whether a municipality itself violated a person's rights or directed its employee to do so, the focus is on the municipality's policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." Gibson, 290 F.3d at 1186 (internal quotation marks omitted); City of St. Louis v. Praprotnik, 485 U.S. 112, 121, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). When a Monell claim is predicated on an official municipal policy, a single incident can suffice for liability "under appropriate circumstances." Pembaur, 475 U.S. at 480, 106 S.Ct. at 1298. However, where, as here, a plaintiff's Monell claim is not based on a formal or written rule, regulation, or policy, but on a custom or practice, the plaintiff must prove that "[t]he custom [is] so persistent and widespread that it constitutes a permanent and well settled city policy." Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996), cert. denied, 520 U.S. 1117, 117 S.Ct. 1249, 137 L.Ed.2d 330 (1997) (internal quotation marks and citation omitted).
Plaintiff's concern that training of the type defendants concede Crawford received - to enter a home under the false pretense of having a search warrant - raises serious questions of potential municipal liability. However, "[l]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." Trevino, 99 F.3d at 918. Here, other than the underlying incident, plaintiff has not put forth evidence *995 suggesting that the City's practice of falsely announcing to an occupant of a residence that the officer has a search warrant is widespread or consistent.[21] (See, generally, Dkt. 53, Joint Br.). Plaintiff thus has not raised a triable issue of fact as to a Monell "first path" theory of liability.
B. Failure to Train Re: Exigent Circumstances.
Under the second path, plaintiff claims that Monell liability exists for the City's "failure to train its officers at how to conduct a warrantless entry into a home based upon exigent circumstances." (Dkt. 53, Joint Br. at 29).
The inadequacy of the City's training may serve as the basis for § 1983 liability "[o]nly where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants." City of Canton v. Harris, 489 U.S. 378, 389, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989) (" Harris") (internal quotation marks omitted); see Johnson v. Hawe, 388 F.3d 676, 686 (9th Cir. 2004), cert. denied, 544 U.S. 1048, 125 S.Ct. 2294, 161 L.Ed.2d 1088 (2005) (" Hawe") (finding that plaintiff's expert declaration asserting that defendant's self-training program amounted to a failure to train created "at least a genuine issue as to whether 'self-training' in this context amounted to deliberate indifference"); see also Oviatt By & Through Waugh v. Pearce, 954 F.2d 1470, 1473-74 (9th Cir. 1992) (describing deliberate indifference standard in cases of local government inaction). Deliberate indifference arises when, "in light of the duties assigned to specific officers or employees[,] the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Harris, 489 U.S. at 390, 109 S.Ct. at 1205. Plaintiff must put forth evidence that the City "disregarded a known or obvious consequence of [its] action" by, for example, showing that policymakers were on "actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights[.]" Connick v. Thompson, 563 U.S. 51, 61, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) ("A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train."). "[E]vidence of the failure to train a single officer is insufficient to establish a municipality's deliberate policy." Blankenhorn v. City of Orange, 485 F.3d 463, 484-85 (9th Cir. 2007) ("[A]bsent evidence of a 'program-wide inadequacy in training,' any shortfall in a single officer's training 'can only be classified as negligence on the part of the municipal defendant - a much lower standard of fault than deliberate indifference.' ") (internal quotation marks omitted).
Here, while plaintiff asserts that Crawford "received no formal training" regarding exigent circumstances, (see Dkt. 53, Joint Br. at 28), he offers no evidence that the informal training Crawford received on the topic was so "obvious[ly]" substandard that the deficiency amounted to deliberate indifference. (See, generally, Dkt. 53, Joint Br.; Dkt. 53-1, SUF; Dkts. 53-2, Joint App'x). Moreover, even if the fact that Crawford was acting pursuant to his training when he entered plaintiff's *996 home without a warrant were "sufficient to demonstrate that [Crawford] did not receive proper training, evidence of a single officer's training is insufficient to create a genuine issue of fact as to the Monell liability of a municipality." Schulte v. City of Los Angeles, 361 F.Appx. 748, 748 (9th Cir. 2010) (plaintiff had failed to create a genuine issue of fact as to Monell liability where "[t]he only evidence that [plaintiff] presented demonstrating the City's customs or policies with respect to warrantless entries was [defendant's] testimony that he was acting pursuant to his LAPD training when he entered [plaintiff's] home"); see Flores v. Cty. of Los Angeles, 758 F.3d 1154, 1159 (9th Cir. 2014) ("The isolated incidents of [ ] wrongdoing by one deputy other than Deputy Doe 1 do not suffice to put the County or [the sheriff] on notice that a course of training is deficient in a particular respect[.]") (internal quotation marks omitted); Marsh v. Cty. of San Diego, 680 F.3d 1148, 1159 (9th Cir. 2012) ("Nor is a showing that a single employee was inadequately trained sufficient; there must be a 'widespread practice.' ") (quoting Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir.1989) ).
In short, plaintiff has failed to raise a triable issue of fact under both his failure to train and municipal custom theories. Accordingly, summary judgment is granted in favor of defendants on plaintiff's Monell claim. See, e.g., Waggy, 594 F.3d at 714 (holding that district court properly granted summary judgment in favor of county defendant because plaintiff failed to present evidence "indicating either what training practices were employed by the county at the time of the alleged constitutional violation, or what type of constitutionally-mandated training was lacking").
III. CPRA CLAIM.
Defendants seek summary judgement on plaintiff's CPRA claim, on the basis that plaintiff's April 25, 2017, and May 5, 2017, requests for reports ("Requests") were properly denied under Cal. Gov. Code § 6254(f) because the investigation was still open. (See Dkt. 53, Joint Br. at 44).
The CPRA "provides for the inspection of public records maintained by state and local agencies." Cal. State Univ., Fresno Ass'n., Inc. v. Sup. Court, 90 Cal.App. 4th 810, 822, 108 Cal.Rptr.2d 870 (2001). Its intent is "to safeguard the accountability of government to the public." Coronado Police Officers Ass'n v. Carroll, 106 Cal.App. 4th 1001, 1015, 131 Cal.Rptr.2d 553 (2003) (internal quotation marks omitted). "In general, it creates a presumptive right of access to any record created or maintained by a public agency that relates in any way to the business of the public agency. Every such record must be disclosed unless a statutory exception is shown." City of San Jose v. Sup. Court, 2 Cal.5th 608, 616, 214 Cal.Rptr.3d 274, 389 P.3d 848 (2017) (internal quotation marks omitted).
Section 6254(f) directs state and local law enforcement agencies to make public "all complaints or requests for assistance received by the agency and the time and nature of the response thereto," including "crimes alleged or committed or any other incident investigated ..., the time, date, and location of occurrence, the time and date of the report, the name and age of the victim, the factual circumstances surrounding the crime or incident, and a general description of any injuries, property, or weapons involved." Cal. Gov. Code § 6254(f)(2)(A). "Any person may institute proceedings for injunctive or declarative relief or writ of mandate in any court of competent jurisdiction to enforce his or her right to inspect or to receive a copy of any public record or class of public records *997 under [CPRA]." Id. at § 6258.[22]
Here, plaintiff's two Requests sought all reports related to the May 28, 2015, entry into the Dalton residence. (See Dkt. 53-14, Exh. 6, "April 25, 2017 Application"; Dkt. 53-15, Exh. 7, "May 5, 2017 Application"). Other than providing plaintiff with the face sheet of the search warrant, the Glendora Police Department denied the Requests. (See Dkt. 53-10, Goodin Decl. at 2-3). On the first request, signed by Crawford, the boxes for "under investigation" and "not available" are checked, and on the second, those boxes are unchecked, but the document says, "Per Crawford, do not release other than face sheet." (Dkt. 53-15, May 5, 2017 Application). In other words, the only justification provided by defendants for not disclosing the records was that the case was still under investigation.
However, plaintiff submitted evidence that raises a triable issue of fact as to whether that was indeed the case. Specifically, plaintiff submitted a report dated October 22, 2015, in which Crawford wrote: "Due to the DNA analysis report, this case will not be filed against suspect Goodin. The case will be cleared internally without further action." (Dkt. 53-5, DNA Analysis Report at ECF 1484-89; see Dkt. 53-7, Crawford Depo. at 168-69). It is undisputed that the Glendora Police Department did not file criminal charges against plaintiff because of the DNA evidence. (Dkt. 53-1, SUF at P69; see Dkt. 53-7, Crawford Depo. at 30, 152, 153, 156, 168-69, 175-79, 181). In addition, Crawford later testified that when he signed the form denying plaintiff's April 25, 2017, Request, he was no longer in the detective bureau, and "was not conducting further follow-up" on the case. (See Dkt. 53-7, Crawford Depo. at 30, 152, 153, 156, 168-69, 175-79, 181, 182-83). Finally, with respect to plaintiff's May 5, 2017, Request, the box for "under investigation" is not checked. (Dkt. 53-15, May 5, 2017 Application). In short, plaintiff's evidence, along with the undisputed fact that plaintiff submitted the Requests two years after the underlying incident, raises a material factual dispute as to whether the case was actually "under investigation" when defendants refused to provide plaintiff with the requested records.
Defendants also argue that because the Hobbs Attachment was ordered sealed, disclosing any of the records could have "jeopardize[d] the safety of the [confidential informant(s) ], ... compromise[d] the criminal investigation, and ... violat[e]d ... the ... sealing order with respect to the Hobbs Attachment." (Dkt. 53, Joint Br. at 44). But defendants provide no explanation as to why they could not have simply excluded the Hobbs Attachment and otherwise responded to the Requests. (See, generally, id. at 43-44). While defendants were not required to release the identity of any confidential informants, see Cal. Gov. Code § 6254(f), the CPRA does require defendants to release "the time, date, and location of occurrence, the time and date of the report, the name and age of the victim, the factual circumstances surrounding the crime or incident, and a general description of any injuries, property, or weapons involved." Cal. Gov. Code § 6254(f)(2)(A).
Under the circumstances, a reasonable jury could find that the investigation was no longer open and that defendants violated the CPRA by improperly denying plaintiff's Requests and failing to release all of *998 the disclosable information requested by plaintiff. Accordingly, defendants are not entitled to summary judgment on plaintiff's CPRA claim.
CONCLUSION
Based on the foregoing, IT IS ORDERED THAT:
1. Plaintiff's Motion for Summary Judgment (Document No. 53) is granted in part as to his claim of unlawful entry in violation of the Fourth Amendment. The Motion is denied in all other respects.
2. Defendants' Motion for Summary Judgment (Document No. 53) is granted in part as to plaintiff's claim pursuant to Monell v. Dep't of Soc. Servs., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The Motion is denied in all other respects.

Statutory references are to title 42 of the United States Code unless otherwise indicated.

Unless otherwise noted, the facts are undisputed and/or contain disputes that are not material.

The parties do not explain why Glendora police officers were surveilling a residence located in La Puente. (See, generally, Dkt. 53, Joint Br.).

The time Crawford received the CI's call is disputed. Plaintiff asserts, based on Crawford's testimony, that "Defendant Crawford does not know what time the exigent circumstance arose." (See Dkt. 53-7, Crawford Depo. at 53 & 54). Defendants contend that the phone call occurred about ten minutes before the officers entered the Dalton residence at 1:09 p.m. (See Dkt 53-1, SUF at P52 (defendants' response); Dkt. 54-4, Sealed Crawford Decl. at ¶ 12).

The record is unclear as to whether there are one or two confidential informant(s). Crawford's declaration is inconsistent in its references to the confidential informant(s), referring to the May 13 confidential informant as "CRI-1," (see Dkt. 54-4, Sealed Crawford Decl. at ¶ 7), and the May 28 confidential informant, at times, as "CI-1" (see id. at ¶ 10), and at other times as "CR-1." (See id. at ¶ 12). Because it appears to be more consistent with defendants' theory, the court will assume there were two different confidential informants for the purposes of this Motion.

It was later determined that the methamphetamine was in the possession of plaintiff's roommate. (See Dkt. 53-1, SUF at P62 & P68; Dkt. 53-10, Goodin Decl. at ¶ 3; Dkt. 53-7, Crawford Depo. at 157-58 & 179).

All six officers on the scene entered the Dalton residence because Crawford believed, for "officer safety purposes," that he could not spare one officer to go get a search warrant. (See Dkt. 53-1, SUF at P6; Dkt. 53-7, Crawford Depo. at 56 & 57).

Defendants contend that Crawford yelled this prior to entering the house, (see Dkt. 53-1, SUF at D30; Dkt. 54-4, Sealed Crawford Decl. at ¶ 13), while plaintiff asserts that Crawford opened the door before demanding entry. (See Dkt. 53-1, SUF at D30; Dkt. 53-4, Exh. 4, July 10, 2015 Incident Report at ECF 1464; Dkt. 53-7, Crawford Depo. at 146-47).

While defendants' statement of undisputed facts asserts that they did not point their guns at plaintiff, (see Dkt. 53-1, SUF at D41 & D42), the only evidence they cite for that proposition, Crawford's declaration, does not support that factual assertion. (See, generally, Dkt. 53-18, Crawford Decl.). In any event, defendants seem to concede that they did point their guns at Goodin in a different, undisputed fact. (See Dkt. 53-1, SUF at D65). Accordingly, the evidence cited by plaintiff that the officers pointed their guns at Goodin is undisputed. (See Dkt. 53-17, Goodin Depo. at 46, 47, 76, 77).

A Hobbs Attachment is incorporated into a search warrant, and filed under seal to protect the identity of the confidential informant. See People v. Hobbs, 7 Cal.4th 948, 971, 30 Cal.Rptr.2d 651, 873 P.2d 1246 (1994) ("[A]ll or any part of a search warrant affidavit may be sealed if necessary to implement the privilege and protect the identity of a confidential informant[.]").

The reason plaintiff hid the phone in the fish tank is disputed, with defendants contending that Goodin hid his cell phone to prevent detectives from seeing the "information" in it, and plaintiff asserting he did not want defendants to see his pictures. (See Dkt. 53-1, SUF at D49).

"In determining any motion for summary judgment or partial summary judgment, the Court may assume that the material facts as claimed and adequately supported by the moving party are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' and (b) controverted by declaration or other written evidence filed in opposition to the motion." Local Rule 56-3.

Defendants attempt to counter this fact by relying on the Hobbs Attachment. (See Dkt. 53-1, SUF at P49) (defendants' response). However, the Hobbs Attachment does not set forth any specific facts supporting a reasonable belief that drugs were going to be destroyed or transported prior to defendants' warrantless entry into the Dalton residence. (See, generally, Dkt. 54-2, Hobbs Attachment). In other words, the Hobbs Attachment is consistent with plaintiff's factual assertion, i.e., that the Hobbs Attachment does not cite or refer to any facts indicating that any drugs in the Dalton residence were about to be transported from the house. (See, generally, id. ). Also, the evidence defendants offer regarding Crawford's purported belief that drug transportation was likely to occur is a conclusory and unsupported statement in the July 10, 2015 Incident Report - prepared approximately six weeks after the incident - that, "[b]ased on the information [Crawford] had developed there was the possibility the narcotics could be moved[.]" (Dkt. 53-4, July 20, 2015 Incident Report at ECF 1464). Defendants provide no specific facts or evidence to describe what information Crawford had developed. (See, generally, Dkt. 53-6, Joint App'x).

If, on the other hand, the confidential informants were actually the same person, the assumption that the CI would tip off Goodin would have been even more implausible, given Crawford's professed belief that CRI-1 was reliable and had provided evidence in the past that led to arrests. (See Dkt. 54-1, Sealed SUF at P3, D8, D9; Dkt. 53-7, Crawford Depo. at 41, 51, 55; Dkt. 54-4, Sealed Crawford Decl. at ¶¶ 7-8).

As for defendants' reference to actions that took place after they entered the Dalton residence as "confirming [their] suspicions," (Dkt. 54, Sealed Joint Br. at 32), such actions cannot, ex post facto, provide exigent circumstances to justify entering the Dalton residence without a warrant. "[T]he critical time for determining whether any exigency exists is the moment the officer makes the warrantless entry. They cannot rely on exigencies discovered once they are inside." Johnson, 256 F.3d at 907 ; see Lindsey, 877 F.2d at 781 ("The exigencies must be viewed from the totality of circumstances known to the officers at the time of the warrantless intrusion.") (internal quotation marks omitted).

Defendants cite the report of their expert, Robert Fonzi, (see Dkt. 53, Joint Br. at 26), who opines that there was probable cause and exigent circumstances for defendants to enter the Dalton residence. (See Dkt. 54-3, Report of Robert Fonzi at 4-6). The expert's report contains mostly legal conclusions, as opposed to specific and articulable facts. While "expert testimony concerning an ultimate issue is not per se improper[,] ... an expert witness cannot give an opinion as to her legal conclusion, i.e., an opinion on an ultimate issue of law." Mukhtar v. Cal. State Univ., 299 F.3d 1053, 1065 n.10 (9th Cir. 2002), overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc., 740 F.3d 457, 467 (9th Cir. 2014) (emphasis in original). Defendants' expert improperly "undertakes to tell the [court] what result to reach," by "substitut[ing] the expert's judgment for the [court]'s." Mukhtar, 299 F.3d at 1065 n.10 (quoting United States v. Duncan, 42 F.3d 97, 101 (2d Cir. 1994) ).

Because no exigent circumstances justified defendants' warrantless entry into the Dalton residence, the court does not address whether there was probable cause to search the residence. See Payton, 445 U.S. at 587-88, 100 S.Ct. at 1381 ("[A]bsent exigent circumstances, a warrantless entry ... is unconstitutional even when a felony has been committed and there is probable cause to believe that incriminating evidence will be found within."); LaLonde, 204 F.3d at 954 ("[I]t is well settled constitutional law that, absent exigent circumstances, probable cause alone cannot justify an officer's warrantless entry into a person's home."); Blake, 632 F.2d at 734 (holding, in case involving stakeout of suspected bank robber's home, that although the officers had a "high degree of probable cause to arrest the appellant," warrantless entry was unjustified because there were no exigent circumstances).

Arguably, in cases involving the apprehension of a co-conspirator, as compared to cases involving a tip to police from a confidential informant, there is a higher likelihood that a suspect will learn of an impending raid from a co-conspirator. Whereas co-conspirators have incentives to notify each other of an impending raid so as to hide or destroy evidence of their mutual crimes, confidential informants generally have no such incentives, as it would be contrary to an informant's interests to inform the suspect that he (the confidential informant) has notified law enforcement of the suspect's illegal activities.

Driver, which set forth the requirement that the government "attempt, in good faith, to secure a warrant or ... present evidence explaining why a telephone warrant was unavailable or impractical[,]" 810 F.2d at 883, does not specifically discuss circumstances tending to indicate it would have been feasible to secure a warrant prior to entry. See, generally, id. However, there is no indication in Driver that the government made any attempt to obtain a warrant, see, generally, id., and it appears that there were at least two law enforcement officers present. See id. at 809 (two officers remained at the warehouse following the raid, while the others went back to the station to secure a search warrant).

Examples of this "direct path to municipal liability" include a facially unconstitutional city policy discriminating against pregnant women, and a policy that policymakers knew would violate a detainee's right to personal security. See Gibson, 290 F.3d at 1185-86.

As the court finds that plaintiff has not met his burden to raise a triable issue of fact that there was a widespread City practice, the court need not address defendants' arguments regarding causation.

Given that the plain text of the CPRA allows "any court of competent jurisdiction" to hear CPRA claims, and that this court has supplemental jurisdiction under 28 U.S.C. § 1367, defendants' argument that this court "has no subject matter jurisdiction" over this claim is unpersuasive. (Dkt. 53, Joint Br. at 43).